Davis, J.,
delivered the opinion of the majority of the court:
What were known in 1784 as the “New York Indians” consisted of six nations or tribes, called Senecas, Onondagas, Cayugas, Tuscaroras, Oneidas, and Mohawks. The Mohawks soon after left the United States for Canada, and in 1797 relinquished by treaty all claims to land in New York. (Treaties of 1784, 1789, and 1797, 7 Stat. L., 15, 33, 61.)
The title to the lands occupied by the New York Indians in New York was prior to 1786 claimed both by New York and Massachusetts, which agreed in 1786 that New York should *438 exercise “government, sovereignty, and jurisdiction” of tbe territory, while Massachusetts reserved “the right of preemption of the soil from native Indians” in certain named parts of the State, the right of preemption as to the rest of the territory being relinquished to New York. The preemption rights of Massachusetts were afterwards (in 1791) granted to Robert Morris and by him were transferred (except as to one tract) to the Holland Land Company.
By various treaties between the United States and the Indians the latter were secured in their right to the lands upon which they were settled and whose boundaries were fixed. In one of these treaties, that of 1794, the United States engaged that they would never claim the lands or disturb either of the Six Nations or their Indian friends united with them in the free use and enjoyment of the lands, but that the Indians should remain upon the lands until they chose to sell them to the United States, the Six Nations upon their part agreeing not to claim any other lands within the United States.
Beginning in 1810, a movement appears to have been made for the removal of the New York Indians to the Northwest, and, with the approval of the United States G-overnment, they purchased from the Menomonie and Winnebago tribes lands in Wisconsin. This transaction was completed in 1823, and thereafter some pf the New York Indians removed to Wisconsin. Dispute there arising between them and the Menomonies, fresh agreements were concluded by the Government, and the Indian rights in the Wisconsin .lands were recognized by the President and the Congress.
The treaty with tiñe Menomonies, assented to by the New Yorks, provided that the lauds in Wisconsin should be held under such tenure as that by which the Menomonies had before held them, “subject to such regulations and alterations of tenure as Congress and the President of the United States shall from time to time think proper to adopt.”
It therefore appears from the treaties and the findings that prior to February, 1831, plaintiffs, with the approbation of the President, had purchased from the Menomonie and Winnebago Indians some rights in land in Wisconsin near Green Bay; that questions had arisen in relation to this purchase which were finally settled by a treaty between the Menomonies and the United States, ratified in 1832.
*439 Coming now to January, 1838, we imd that relatively few New York Indians bad emigrated to Wisconsin; but the reasons why they had not done so were satisfactory to the President, who had the right to prescribe the time of removal. Prior to this, however, some of the New York Indians had asked that their Wisconsin lands should be taken by the Government and a new home provided for them in the West. Thereupon the treaty of January 15, 1838, known as the treaty of “ Buffalo Creek,” was negotiated, and after amendment by the Senate was proclaimed by the President.
Upon this treaty plaintiffs found the alleged rights which they seek to enforce here, and the claim presented, as defined by the special statute, is that of the New York Indians (being those Indians who were parties to the treaty of Buffalo Creek) against the United States growing out of the unexecuted stipulations of said treaty on the part of the United States.
The situation when this treaty was signed was briefly this: The Indians had rights in lands in New York and in Wisconsin,- and these rights had value; relatively few Indians had emigrated to Wisconsin, and the reasons for so small an emigration were satisfactory to the President; a desire had been expressed by some of the New York Indians to go west, with a willingness to surrender their lands in Wisconsin for lands west of the Mississippi; the United States were glad of an opportunity to pursue their policy of moving all Indian tribes westward.
■It was therefore, in substance, agreed in the treaty that the Indians cede to the United States all their rights in the Wisconsin lands (except a small reservation); that the United States set apart for them a permanent home west of the Mississippi upon a tract described by metes and bounds; this land the Indians were to hold in conformity with section 3 of the act of May 28,1830, the tract to be divided among the different tribes, nations, or bands in severalty in proportion to population, with some special provisions as to certain tribes. The United States agreed to protect the Indians in their new home, and agreed that the land “should never be included in any State or Territory of the Union.” The United States agreed to pay certain sums to the different nations and tribes on their removal west. The United States agreed to appropriate 8400,000 for the expenses of removal and also to assist the Indians in various ways in beginniug life in their new home.
*440 The defendants have complied with the specific obligations assumed by them under this treaty to this extent alone: In 1846 they removed some 200 or more Indians to the new reservation (all, apparently, who wished to remove), and paid therefor the sum of $9,464.08; they allotted to 32 of these Indians 10,240 acres of land; in 1867 they secured from the Tonawanda band of the Senecas a release of all their rights under the treaty and in the lands, and paid them for this the sum of $256,000. In no other way, so far as appears, have the United States attempted to carry out their obligations under the treaty of Buffalo Creek.
We have given a concise statement of the situation existing when the treaty of Buffalo Creek was negotiated, as we understand it. Our knowledge of this situation is chiefly gleaned from treaties, their recitals, their appendices, and the official action of duly authorized agents of Government in relation to them. Some further facts appear in the findings, but gener-erally the history of the relations of these tribes to the Government and the situation, political and contractual, in 1838 is deduced from the treaties themselves and their appendices, which we will now examine more carefully.
In 1784 the United States by treaty secured the Oneida and Tuscarora nations in the possession of the lands upon which they were settled, and fixed the boundaries of the lands of the Six Nations, it being agreed by the United States that the Six Nations should be secured in the peaceful possession of the lands they then inhabited east and north of the boundaries fixed.
The stipulations of this treaty were renewed and confirmed in 1789, when the boundary was again described in the same terms as in the treaty of 1784, and the Indians relinquished and ceded to the United States the lands west of the defined boundary. The Mohawks were not parties to the treaty of 1789.
In 1794 another treaty was concluded with the Six Nations, guaranteeing peace and friendship perpetual between the parties, acknowledging the lands reserved to the Oneida, Onondaga, and Cayuga nations in their treaty with the State of New York to be their property, engaging that the United States would never claim the same or disturb them, or either of the Six Nations, nor their Indian friends residing thereon and united with them, in the free use aud enjoyment thereof, and *441 agreeing that the said, lands should remain theirs until they chose to sell the same to the United States, who “have the right to purchase.” The land of the Seneca Nation is also described by metes and bounds in this treaty, acknowledged as their property, confirmed as theirs until they chose to sell to the United States, who “ have the right to purchase.” The United States having thus described and acknowledged the lands of the Oneidas, Onondagas, Oayugas, and Senecas, and engaged never to claim the same nor disturb the Sis Nations in the free use and enjoyment thereof, the Six Nations, upon their side, agreed never to claim any other lands within the boundaries of the United States.
In 1810 some of the New York Indians petitioned the Presi-' dent for leave to purchase reservations of their Western brethren, with the privilege of removing to them and occupying them. Thereupon, with the approbation of the President, land at Green Bay, Wis., was bought by them from the Menomonies and Winnebagoes.
Eleven years later the Menomonies ceded to the Stockbridge, Tuscarora, St. Regis, and Munsee nations, for a small money consideration, two tracts of land in Wisconsin. The title to these tracts was confirmed by the President in March, 1823.
Later, Indians belonging to the Oneida, St. Regis, Munsee, and Brothertown tribes moved to the Wisconsin lands, and questions arose which resulted in the .treaty of 1831.
In this treaty (7 Stat. L., p. 342) the Menomonies, after denying that they had sold any lands, make the following statement :
“ For the purposes, therefore, of establishing the boundaries of their country and of ceding certain portions of their lands to the United States, and in order to secure great and lasting benefits to themselves and posterity, as well as for the purpose of settling the long-existing dispute between themselves and the several tribes of New York Indians who claim to have purchased a portion of their lands, the undersigned * _ * * stipulate and agree with the United States as follows,” etc. It will be noted that the agreement is with the United States; that any rights in the New York Indians to Menomonie lands are denied (see Article I); but the Menomonies do agree, at the solicitation of the President, that such lands, within certain boundaries, as he may direct, “ may be set apart as a home to the several tribes of the New York Indians who may remove to and settle upon the same within three years from the date of this agreement.”
*442 Further on in the same article occurs this paragraph:
“ The country ceded to the United States for the benefit of the New York Indians contains by estimation about 500,000 acres. * * * Asitis intended for a home for the several tribes of the New York Indians who may be residing upon the lands at the expiration of three years from this date, and for none others, the President of the United States is hereby empowered to apportion the lands among the actual occupants at that time. * * * And if at the time oi such apportionment any lands should remain unoccupied by any tribe, of New York Indians, such portion as would have belonged to such Indians had it been' occupied shall revert to the United States. * * * It is distinctly understood that the lands hereby ceded to the United States for the New York Indians are to be held by those tribes under such tenure as the Menomonie Indians now hold their lands, subject to such regulations and alteration of tenure as Congress and the President of the United States shall from time to time think proper to adopt.”
For this “ cession to the United States for the benefit of the New York Indians” the sum of $20,000 was to be paid. It was also stipulated that-such part of the treaty as relates to the New York Indians should be immediately submitted to them, and if they refused to accept the provision made for their benefit and to move to the lands set apart for them on the west side of Fox River, that their immediate removal from the Menom-onie country be directed. (Ibid., p. 345.)
Nine days later (February 17, 1831) an amendment to the treaty was signed, induced by certain reasons, one of which was “to make unlimited the time of removal and settlement upon these lands by the New York Indians, but to leave both these matters discretionary with the President of the United States;” so it was agreed that such part of the first article of the treaty as limits the removal and settlement of the New York Indians to three years shall be altered so that the President shall prescribe the time for removal and settlement. No limit is put upon that time.
To the arrangement made by this treaty the New York Indians assented, and thereafter the title to the land described in the treaty has been thus recognized by the Congress-and the President as in the New York Indians — in the treaty with the Menomonies of September 3, 1836; in the treaty with the Stockbridges and Munsees of September 3, 1839, and in the treaty with the Tonawanda band of Senecas of November 5, 1857.
*443 It therefore appears that prior to February, 1831, the plaintiffs, with the approbation of the Government, bad in legal effect purchased from the Menomonie and Winnebago Indians certain rights in Wisconsin lands; that questions had arisen between them and the Menomonies which were finally settled by a treaty between the Menomonies and the United States, ratified in 1832; that this treaty contained a provision securing to the New York Indians, in consideration of $20,000 paid by the United States, 500,000 acres of land at Green Bay, on condition that they should remove to the same within three years or such reasonable time as the President of the United States should prescribe; and the United States set apart out of another tract of land, acquired by the same treaty, three townships for the Stockbridge, Munsee, and Brothertown tribes. It further appears that in January, 1838, no substantial number of the plaintiffs had removed to the Wisconsin lands, but they had been prevented from doing so by reasons accepted as sufficient by the President. (Treaty of 1838, vol. 7, Stat. L., p. 550.) Prior to this date, however, some of the New York Indians had applied to the President to take their Green Bay lands and provide them a new home in the Indian Territory. Pursuing the Government policy of removing the Indians to the west of the Mississippi, the President acted upon this application; the treaty of Buffalo Creek, dated January 15, 1838, was signed, and after amendment was consented to and proclaimed.
The treaty of Buffalo Creek provides (in consideration of certain premises and of the covenants contained in the treaty itself, to be performed by the United States) that the New York Indians cede and relinquish to the United States all their right, title, and interest in and to their Green Bay lands (excepting a small reservation), and in consideration of this cession and relinquishment the United States, in and by the treaty, agree and guarantee as follows:
First. To set apart, as a permanent home for the plaintiffs, a certain tract of country west of the Mississippi Biver (described by metes and bounds), to include 1,824,000 acres of land, to be held in fee simple by the said tribes or nations of Indians by patent from the President of the United States, in conformity with the provisions of section 3 of the act of Congress of May 28, 1830, entitled “An act to provide for an exchange of lands *444 with the Indians residing in any of tlie States and Territories and for their removal west of the Mississippi, the same to be divided among' the different tribes, nations, or bands in sever-alty,” it being understood that the said country was intended as a future home for the following tribes: The Senecas, Ouon-dagas, Cayugas, Tuscaroras, Oneidas, St. Eegis, Stockbridges, Munsees, and Brothertowns; and was to be divided equally among them, according to the number of individuals in each tribe (as set forth in a schedule annexed to the treaty and designated as Schedule A), on condition that such of the plaintiffs as should not accept and agree to remove to the country set apart for them within five years, or such other time as the President might from time to time appoint, should forfeit to the United States all interest in the lands so set apart. The following is the Schedule A :

Census of the New York Indians, as talcen in 18S7.

Number residing on the Seneca reservations:
Senecas. 2,309
Onondagas. 194
Cayugas. 130
2,633
Onondagas at Onondaga. 300
Tuscaroras. 273
St. Eegis in New York. 350
Oneidas at Green-Bay. 600
Stockbridges. 217
Munsees. 132
Brothertowns. 360
Second. The United States agreed to protect and defend the plaintiffs in the peaceable possession and enjoyment of their new homes and to secure their right to establish their own government, subject to the legislation of Congress respecting trade and intercourse with the Indians.
Third. The United States agreed that the lands secured to plaintiffs by the treaty should never be included in any State or Territory of the Union.
Fourth. The United States agreed to pay to the several tribes and nations of Indians hereinafter mentioned, on their removal West, the following sums respectively, namely: To the St. Eegis tribe, $5,000; to the Seneca Nation, the income annually of $100,000, being part of the money due said nation for lands sold by them in New York, and which sum they authorized to be paid to the United States; to the Cayugas, *445 $2,500 cash and tbe annual income of $2,500; to the Onondagas, $2,500 cash and the annual income of $2,500; to the Oneidas, $6,000 cash, and to the Tuscaroras, $3,000.
Fifth. The United States agreed to appropriate the sum of $400,000, to be applied from time to time by the President of the United States for the following purposes, namely: To aid the plaintiff's in removing to their new homes and supporting themselves the first year after their removal; to encourage and assist them in being taught to cultivate their lands; to aid them in erecting mills and other necessary houses; to aid them in purchasing domestic animals and farming utensils and in acquiring a knowledge of the mechanic arts. By supplemental article the St. Regis Indians assented to the treaty, adding this stipulation, viz:
“And it is further agreed that any of the St. Regis Indians who wish to do so shall be at liberty to remove to the said country at any time hereafter within the time specified in this treaty, but the Government shall not compel them to remove.”
The treaty of January 15, 1838, as amended by the Senate June 11, 1838, was assented to September 28, 1838, by the Seneca tribe of New York Indians; August 9, 1838, by chiefs of the Oneida tribe; August 14,1838, by the Tuscarora Nation residing in New York; August 30, 1838, by Cayuga Indians residing in New York; October 9,1838 (with the reservation above noted), by the St. Regis Indians residing in New York; August 31, 1838, by the Onondaga tribe of Indians on the Seneca reservations in the State of New York.
The date of the acceptance of the treaty as amended by the Senate June 11, 1838, by the following tribes: Onon dagas at Onondaga, Oneidas at Green Bay, Stockbridges, Mnnsees, Brothertowns, does not appear, but the court is of opinion, and so holds, that they did accept, and this for the following reasons:
The Senate, after the treaty had been sent to them, resolved that it be ratified, provided, among other things, that the ratification have no effect until the treaty with the Senate amendments be submitted and explained to each of the tribes or bands separately and they have given their free and voluntary consent thereto; that as to those assenting the treaty take effect; .as to the others they should cease to be parties to it, and the President should thereupon make a proportionate reduction from the $400,000 fund and the quantity of land provided for west of *446 tbe Mississippi. Later, when tlie treaty was again before the Senate, a resolution was passed which in substance provided that when the President should be “satisfied that the assent of the Seneca tribe of Indians has been given to the amended treaty” with the New York Indians according to the first resolution, then the President might proclaim the treaty and carry it into effect. It is apparent at this point that, except the Senecas, all the New York Indians in the Senate’s opinion had assented to the amended treaty. This second resolution was adopted March 2, 1839. A year later (March 25, 1840) the Senate passed this resolution:
“That in the opinion of the Senate the treaty between the United States and the Six Nations of the New York Indians, together with the amendments proposed by the Senate of the 11th of June, 1838, have been satisfactorily acceded to, approved by said tribes, the Seneca tribe included, and that in the opinion of the Senate the President is authorized to proclaim the treaty as in full force and operation.”
Thereupon followed the President’s proclamation, wherein we find the following recitals:
“Whereas a treaty was made and concluded at Buffalo, * * * by * * * a commission on the part of the United States and the chiefs, headmen, and warriors of the several tribes of New York Indians assembled in council; and whereas the Senate did * * * advise and consent to the ratification of said treaty with certain amendments; * * * and whereas the Senate did [pass the resolution of March 25, 1840 (supra)]: Now, therefore, be it known that I, Martin Yan Burén, President of the .United States of America, do [pursuant to the two Senate resolutions (supra)] accept, ratify, and confirm said treaty, and every article and clause thereof, * * * [dated April 4th, 1840].”
It therefore appears that the question of assent on the part of all the parties was maturely considered by the treaty-making power at the time, and that piower in both its branches was convinced, and so decided, that all the New York Indians had assented to the treaty as amended. Behind that authoritative decision we are not disposed to look, even if we have the power to do so.
That we have not the power has already been thus decided:
An objection was taken on the argument to the validity of the treaty on the ground that the Tonawanda band of the Seneca Indians was not represented by the chiefs and headmen of the *447 batid in tbe negotiations and execution of it. But the answer to this is that the treaty, after being executed and ratified by the proper authorities of the Government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation than they can go behind an act of Congress. (Fellows v. Blacksmith, 19 Howard, p. 372.)
Further, the United States, having decided that the treaty was properly executed, can not now say, in this action, that the Indians did not assent to it.
While this treaty of 1838 was being negotiated, the Six Nations had a valuable interest of some, kind in many acres of land in the State of New York. The nature of this interest is not important in this case ; it is enough for our purposes that it had value.
The Indians had also an interest in lands in Wisconsin, the technical legal character of which it may be difficult to define in the language of the common law, but which afforded substantial consideration for any contract with the Government.
It does not seem to us necessary to examine the quality or value of their rights in these lands. This question of the Indian tenure has been so frequently the subject of judicial, legislative, and executive consideration and determination that we can subserve no useful purpose by reexamining and discussing it. Sufficient for the purpose of this action is it that the Indians had substantial rights to barter in any contract they might make with the Government in regard to the surrender of any part of their tenure; and in agreeing to move west of the Mississippi and to surrender their Wisconsin rights the Indians furnished a sufficient consideration for the contract of 1838. That agreement is sustained as a valid agreement, having all the necessary elements of a binding contract. It has long been decided that treaties between the Government and the Indians are to be treated as contracts. (Foster v. Neilson, 2 Peters, p. 314; Headmoney Cases, 102 U. S., p. 540.) The amount and sufficiency of the consideration it is no part of our duty to consider.- W e should not and we can not decide whether the bargain was more advantageous to the plaintiffs or to the defendants. No fraud is shown by the plaintiffs, nor undue influence, nor intimidation, nor mistake. It only *448 remains for us to see whether any rights secured by the treaty have been violated.
We reach now the main point in this litigation, which substantially turns upon the duties imposed by the provisions of the treaty which set apart certain lands in Kansas for plaintiffs, to be divided equally among them, according to a certain schedule, on condition that such of them as shall not accept and agree to remove to the country set apart for them within five years, or such other time as the President may from time to time appoint, shall forfeit to the United States all interest in the lands set apart; upon the provisions which contain an agreement that the United States shall protect and defend the plaintiffs in their new homes, and secure their right to establish their own government, and upon the provisions which stipulate that the Kansas lands secured by the treaty shall never be included in any State or Territory of the Union; upon the provisions which promise to pay a certain fixed sum to each of several of the tribes on their removal West, and to appropriate $400,000 to be applied to aid plaintiffs in removing, to support them for a year after removal, and to aid them in various ways.
The President has fixed no time for removal; few of the Indians have been removed; the lands secured to plaintiffs by the treaty have become part of the. State of Kansas, turned into the public domain, surveyed and sold, and a small part only of the appropriation of $400,000 has been made.
There was one exception to this general statement: In 1845 Abram Hogeboom represented to the Government that a number of the New York Indians desired to remove to the Kansas lands. To aid in the accomplishment of this wish, Hogeboom was appointed special agent of the Government. He reported 271 as mustered for emigration. Some of these did not leave New York, and 191 only arrived in Kansas. This was in June, 1846. Later, 17 other Indians arrived; 62 Indians are known to have died and 17 to have returned to New York. Of all these Indians, only 32 received patents or certificates of allotment of any of the lands mentioned in the first article of the treaty of Buffalo Greek, the allotment being at the rate of 320 acres each, or 10,240 acres in all.
The Kansas lands, then, have been sold or otherwise disposed of by the Government for a consideration, and the Ton- *449 awandabandof the Senecas alone of all the New York Indians have received money compensation for a failure, real or alleged, on the part of the United States to fulfill their part of the contract of 1838. To that band has been paid, by direction of the Congress, a considerable sum upon the consideration of the release by them of claims upon the United States to the lands west of the State of Missouri, of all claim and right to be removed thither, for support and assistance after removal, and all other claims against the United States under the treaties of 1838 and 1842. In addition to this payment to the Tona-wandas, $9,464.08 was expended in the removal to Kansas of the two hundred or so Indians above mentioned, and the substantial result of the transaction is that the New York Indians remain in New York; that they have lost the Kansas lands, and have received from the defendants in this action, the United States, some lands in Wisconsin, the sum paid the Tonawandas, the sum paid in the removal of the Hogeboom band, and the relatively small grants in Kansas.
It is contended that the Indians by their quiescent attitude in not demanding a transfer west, or in the active opposition of the tribes to such a transfer, have forfeited any rights they may have had in the Kansas lands. Upon the following article of the treaty this contention substantially rests:
“Article 3. It is further agreed that such of the tribes of the New York Indians as do not accept and agree to remove to the country set apart for their new homes within five years, or such other time as the President may from time to time appoint, shall forfeit all interest in the lands so set apart to the United States.” (7 Stat. L., p. 552.)
The emigration west was to take place within five years, or such other time as the President might appoint, and might appoint, not at any fixed period, not once for all, but “from time to time.” The intent, then, of the article was not that there should be a wholesale emigration of the tribes, but that the emigration should occur at convenient periods, in such way as the President, in his wisdom, might see fit to direct, either within five years or later. The subject-matter of the removal was left to the discretion of the President, and this discretion was not limited to a period of five years, nor to any other period. As to this nothing can be said which would be clearer than the words of the treaty, “ agree to remove *450 * * * within five years, or such other time as the President may from time to time appoint.”
It therefore seems to us unimportant when the five years began to run, but as matter of interest it may be noted that the treaty was first proclaimed April 4,1840. It was after-wards amended aud again proclaimed August 26, 1842, while prior to November 24,1845, some of the Indians had applied to the War Department, under whose care they then were, for the proper steps tobe taken for their emigration. Prior to Novem-. ber, 1845, the Department had not deemed it expedient to enter into any arrangement for this purpose nor until it was assured that a sufficient number to justify the expenditure incident to the appointment of an agent was prepared to remove.
The treaty of 1838 was designed to release the Eastern lands from Indian tenure and to remove the Indians into a country not then settled by whites. The Wisconsin lands were becoming a matter of concern to the Government in the face of emigration westward, and until the Indian tenure (whatever may have been its quality) was extinguished these lands were debarred from settlement. In the removal of the Indians west the defendants had a political and no financial interest, for they had no property rights in the plaintiffs’ New York lands and acquired none.
It was the right of the Government, given it expressly by treaty, to cause the Indians’ removal; but it never attempted to enforce that right either by fixing a time for removal or by fulfilling the obligation imposed upon it by the fifteenth article, to appropriate $400,000 to be applied by the President for certain purposes, the first of which was, “to aid them [the Indians] in removing to their homes and supporting themselves the first year after their removal.” Many of the Indians did not wish to go to the new country; it may be assumed that without Government aid, by way not only of money but in counsel and leadership, they could not go; it may well be doubted whether these Indians had a right to make the pilgrimage to Kansas by their own initiative, without the President’s permission, and without the protection and care of Government agents. The duty of protection was imposed upon the Government, the relations were those of a superior to an inferior, the parties were not on equal footing, “and that ine *451 quality is to be made good by tbe superior justice wbicb looks only to tbe substance of tbe right without regard to technical rules framed under a system of municipal jurisprudence formulating tbe rights and obligations of private persons equally subject to tbe same laws.” (Choctaw Nation v. United States, 119 U. S., pp. 27, 28, and cases cited.)
We have already seen that tbe Supreme Court bolds that no time was fixed for removal (Fellows v. Blacksmith, supra) where tbe court said: “We hold that tbe performance of tbe conditions of tbe treaty was not a duty that belonged to tbe grantees, but to tbe Government, under tbe treaty.”
It is urged that under tbe third article (of tbe treaty of 1838) tbe action, or rather nonaction, of tbe Indians has worked a forfeiture of their Kansas interests. That article provides that those tribes who do not “accept and agree” to remove, and to remove withiD five years or such other time as tbe President may from time to time appoint, shall forfeit all interest in tbe lands. If we are to be purely technical, then there is no forfeiture, for two reasons, first, that all tbe tribes agreed to tbe treaty, hence all accepted it and agreed to remove; and second, tbe President has not yet fixed any time or times for such removal. Beyond this, however, is tbe other point that article 15, wbicb should be read with article 3 (as it relates to tbe same subject-matter), requires tbe United States to provide tbe funds for this wholesale removal, wbicb they have never done in sufficient amount.
A forfeiture at most could be based only upon a refusal by tbe Indians to emigrate, and we do not find that such a refusal was affirmatively made, although undoubtedly and naturally there was a strong disinclination on tbe part of tbe Indians to leave their New York homes for a distant and unknown country. “An interpretation wbicb creates a forfeiture is not to be favored” (Jackson v. Toppin, 1 Wendell, p. 388), and especially where a party to an agreement for an exchange of lands has secured tbe first possession of the premises assigned to him in tbe contract (1 Barbour, p. 634).
Tbe Government could have enforced tbe removal; but it not only took no step to that end, but failed to provide tbe means required of it by tbe treaty to pay for tbe removal; it has been quiescent, tacitly assenting to tbe existing conditions, and tbe Indians have not urged a removal.
*452 When this action was begun, and for years before, the United States were unable by reason of their own acts to carry out the agreement of 1838. The Government had disposed of the lands in Kansas; these have for many years been occupied by settlers, and villages and towns have sprung up upon them. Under such circumstances any formal demand at this time by the Indians for a return of the Kansas lands would be a vain and useless form. The lands they can never recover, and to them the Indians can never be removed. Their only remedy is in a money judgment if they have been wronged. The value of the land as fixed in that treaty we have found as the reasonable value in this case.
As any rights to be enforced in this action rest principally upon the treaty of Buffalo Creek, we must consider that instrument somewhat more fully.
As to the parties to the treaty some question has been made. In the amendments to the treaty made by the Senate July 11, 1838, the Indians are spoken of as “ the New York Indians of the several tribes described in the foregoing article,” and the tribes described in the “foregoing article” (the third article) are the “several tribes described in the foregoing article,” to wit, the second article. Turning now to the second article we find the grant to be to “all the New York Indians now residing in tlie State of New York, or in Wisconsin, or elsewhere in the United States, who have no permanent homes,” and the article thus concludes:
“It is understood and agreed that the above-described country (the Kansas lands described as situated directly west of the State of Missouri) is intended as a future home of the following tribes, to wit: The Senecas, Onondagas, Cayugas, Tuscaroras, Oneidas, St. Regis, Stockbridges, Munsees, and Broth-ertowns, residing in the State of New York, and the same to be divided equally among them according to their respective numbers, as mentioned in a schedule hereto annexed.”
Further on in the treaty we find special provisions made for the following tribes, or special mention made of them, to wit: The Oneidas, Senecas, St. Regis, Cayugas, Onondagas residing on the Seneca Reservation, Oneidas residing in the State of New York, and the Tuscaroras, while the treaty is signed by representatives of the following tribes: Senecas, Tuscaroras, Oneidas residing in the State of New York for themselves *453 and tbeir parties, Oneidas at Green Bay, St. Regis, Oneidas residing on the Seneca Reservation, principal Onondaga warriors in bebalf of themselves and the Onondaga warriors, Oayugas, principal Cayuga warriors in behalf of themselves and the Cayuga warriors; and in the census annexed to the treaty (as Schedule A) are named the Senecas, Onondagas, Oayugas, Onondagas at Onondaga, Tuscaroras, St. Regis in New York, Oneidas at Green Bay, Oneidas in New York, Stockbridges, Munsees, and Brothertowns, while Schedule C is applicable only “to the Onondagas and Oayugas residing on the Seneca reservations.”
Later (February 13, 1838, 7 Stat. L., 561) the St. Regis Indians “having heard a copy of said treaty (of Buffalo Creek) read by Ransom H. Giilet, the commissioner who concluded that treaty on the part of the United States, and he having fully and publicly explained the same * * * the St. Regis who are embraced in its provisions do hereby assent to every part of the said treaty and approve the same.”
August 9,1838, “the undersigned chiefs of the Oneida tribe of New York Indians” gave their free and voluntary assent to the treaty of Buffalo Creek “as amended by the resolution of the Senate of the United States on the 11th day of June, 1838.”
In the following autumn (September 28,1838) the “chiefs of the Seneca tribe of New York Indians residing in the State of New York” “ gave their free and voluntary assent to the foregoing treaty (of Buffalo Creek) as amended by the resolution of the Senate of the United States on the 11th day of June, 1838, and to our contract therewith.” (7 Stat. L., 561.)
Similar consents appear in the statutes (7 Stat. L.) as given by the “ sachems, chiefs, and headmen of the Tuscarora Nation of Indians residing in the State of New York” (ibid., p. 563); by “the chiefs and headmen of the tribe of Cayuga Indians residing in the State of New York” (ibid.); by the “ sachems, chiefs, and headmen of the ‘American party’ of the St. Regis Indians residing in the State of New York,” who prefaced their assent with this condition: “The St. Regis Indians shall not be compelled to remove under the treaty or amendments” (dated October 9,1838, ibid., p. 564); and (August 31, 1838) by the “chiefs, headmen, and warriors of the Onondaga tribe of Indians residing on the Seneca Reservation in the State of New York.”
*454 We tlius find specifically mentioned in tbe treaty or in its appendixes tbe following Indian tribes: Senecas, Onondagas, Onondagas residing on tbe Seneca Eeservation, Onondagas at Onondaga, Cayugas, Cayugas residing on tbe Seneca Eeservation, Cayuga Indians residing in the State of New York, Tuscaroras, Tuscaroras residing in tbe State of New York, Oneidas residing in New York, at Green Bay (Wisconsin), and on tbe Seneca Eeservation; Oneidas, St. Eegis, St. Eegis in New York, tbe American party of tbe St. Eegis residing in tbe State of New York; Stockbridges, Munsees, Brotbertowns.
It appears, then, as a fact that tbe Indians bad full notice ©f tbe treaty and assented to it, thus supporting tbe conclusion reached by tbe President and tbe Senate, a conclusion wbicb, as we bave stated, is conclusive upon us.
It is argued in substance that tbe payment by authority of Congress of a considerable sum of money to tbe Tonawanda tribe involves some admission by tbe defendants of plaintiff’s position, and is in effect an acknowledgment of a right wbicb would lead to plaintiff’s recovery in this cause.
Legislative action is not necessarily a precedent for judicial action, for tbe legislature has a different quality of responsibility and power from tbe courts. Tbe Congress may correct injustice in a matter entirely without judicial jurisdiction, and this right it often exercises. We, however, are limited in this case to tbe grant of jurisdiction given by the special act. Beyond that we can in no event go. If that act fail to give us sufficient power to remedy a wrong (if one bave been done) and to remedy it by judicial method, recourse must again be bad to the legislature.
Tbe Tonawanda appropriation may bave a bearing upon tbe construction of tbe jurisdictional act if that act be obscure, but it does not necessarily show that because tbe Congress believed tbe Tonawandas deserved indemnity therefore tbe other tribes did so equally deserve it. Such an inference is indeed negatived by tbe fact that tbe Congress, while compensating tbe Tonawandas, failed to make any payment to the plaintiffs herein and sent them twice to this court (under different grants of jurisdiction) to prosecute their alleged rights — all this long after tbe Tonawanda appropriation bad been made. The differing action of the Congress in tbe two cases (this case and that of tbe Tonawandas) shows that body to bave been *455 convinced that the Tonawandas were injured, and not to have been convinced that these plaintiffs were injured. As to that the Congress preserved an “open mind.” In the solution of that question they have invoked judicial aid. '
There is a difference in the cases, however, to which as a matter of speculative interest it may be well to refer, for it may have had its influence upon the course pursued.
The treaty of 1842 (7 Stat. L., 588) between the United States and the Senecas embodies what is therein called an indenture between Thomas Ludlow Ogden and Joseph Fellowes and the chiefs and head men of the Seneca Nation of Indians. In the second article of this indenture the Senecas grant to Ogden and Fellowes, in consideration of certain agreements on their part, “ the whole of the said two tracts of land severally called the Buffalo Creek Reservation and the Tonawanda Reservation, and all the right and interest therein of the said nation.” In the third article it is stipulated that for “the sale and release of the said four tracts of land there shall be paid to the said nation a just consideration sum for the release of the two tracts hereby confirmed to the said Ogden and Fellowes, to be estimated and ascertained as follows.” Briefly, the value of the Indian title and improvements was estimated at $202,000, of which $100,000 was fixed as the value of the title to the four tracts, excluding improvements, and $102,000 was fixed as the value of the improvements on them; of this Ogden and Fellowes were to pay to the Senecas “ such proportion as the value of all the lands within the said two tracts called the Buffalo Creek and Tonawanda reservations shall bear to the value of all the lands within all the said four tracts,” with a similar provision as to the money paid for improvements; the amount of the consideration moneys (Article IY) to be determined by arbitrators, one to be named by the Secretary of War and one by Ogden and Fellowes, who were also to award the amount to be paid to each individual Indian “ out of the sum which, on the principles above stated, they shall ascertain and award to be the proportionate value of the improvements on the said two tracts called the “Buffalo Creek Reservation and the Tonawanda Reservation;” provision is made for an umpire. The arbitrators’ report is to be made in duplicate; one is to be filed “ in the office of the Secretary of the Department of War,” the other given to Ogden and Fellowes. - In the fifth article it is *456 agreed that possession of tlie forest or unimproved portion of tlie land shall be given to Ogden and Fellowes within a certain time after the arbitrators’ report had been filed and of the improved portion within two years thereafter: uProvided always, That the amount to be so ascertained and awarded as the proportionate value of the said improvements shall, on the surrender thereof, be paid to the President of the United States, to be distributed among the owners of the said improvements according to the determination and award of the said arbitrators in this behalf: And provided, further, That the consid eration for the release and conveyance of the said lands shall, at the time of the surrender thereof, be paid or secured to the satisfaction of the said Secretary of the War Department, the income of which is to be paid to the said Seneca Indians annually,” and the article concludes with a provision for individual Indians surrendering land and improvements prior to two years. The sixth article relates to Indians desiring to remove from the State of New York “ under the provisions of any treaty made or to be made,” and that the interest or income of their share of the said funds, etc., shall be paid to the Indians in their new homes, and there are provisions as to any future sale of the Cattaraugus and Allegany tracts.
Defendants’ counsel argues that the Tonawandas refused to allow the appraisal to be made, and this appraisal was a duty which fell upon the Government, not Ogden and Fellowes; this the Supreme Court have decided (Fellowes v. Blacksmith, 19 How., 366-372); it then should have been speedily performed, to enable the Tonawandas to emigrate West, had they so desired; “hence, the United States could not, as against them, claim their share of the land in the West or of the fund of $400,000 on account of their nonremoval within that period. The Tonawandas had therefore a right, even in 1857, under the treaties of 1838 and 1842, to call upon the United States to aid in their removal to the Kansas lands, and to perform its other obligations as to their settlement there, or else to compromise for a reasonable sum. The latter course was adopted, and full satisfaetion made for the error of judgment on the part of the United States.”
Whether this argument be sufficient or not we need not determine; sufficient is it for us that the Congress paid the Tonawandas and did not pay the other New York Indians, but. *457 sent them here under the act of January 28, 1893, wherein is found no admission of any Indian rights.' This is the governing clause of that act:
“That jurisdiction is hereby conferred on the Court of Claims to hear and enter up judgment as if it had original jurisdiction of said case, the claim of the New York Indians, being those Indians who were parties to the treaty of Buffalo Creek, New York, on the fifteenth of January, eighteen hundred and thirty-eight, against the United States growing out of the alleged unexecuted stipulations of said treaty on the part of the United States.”
This, with a waiver of the statute of limitations, is the grant of jurisdiction. No specific mention or exception is made of the Tonawandas, and we can only infer that the Congress found a reason for paying them which does not exist as to the other Indians.
This case has a complicated look at first, for the record is full of petitions and other documents relating to a discussion which began many years ago. In fact, the question is a simple one when extraneous matter is stripped from it.
In the first place, it is to be kept clearly in sight that for the promises contained in the treaty of Buffalo Creek the United States were to receive from the Indians no consideration in money or New York land, and (except in the slight emigration West above described) have received no consideration whatever from the Indians.
The defendants’ motive for the treaty was political. They wished the plaintiffs to move West. The plaintiffs have not moved West and defendants have failed in their purpose. This is the substantial condition to-day, for the slight and unimportant Hogeboom party may be eliminated from the transaction, as the movement simply shows, first, that some few Indians were willing to go to Kansas and were taken to Kansas by the Government, whence many of them returned j second, that the mass of the Indians wished to remain in New York, or at least evinced no desire to leave it.
The search for facts in this case has been somewhat beclouded by the movements of small parties dr by the action of individuals of a race not familiar with governmental methods, which did not have adequate form of political expression, and which was temporaily influenced by the greater sagacity of the white men with whom they dealt. By this we do not mean to *458 intimate that they were improperly influenced or influenced by unfair means. The main and important object of tlie defendants was to move the Indians West before the advancing wave of Anglo-Saxon civilization, and the endeavor to accomplish this object (believed to be beneficent for all parties) led, first, to the grant of the Wisconsin lands; that experiment havingslight success, a second effort was made in 1838 with the Kansas lands, and that substantially failed.
The principal facts are that the Indians did not wish to go West, the Government did not force them to do so, and they are in New York to-day. Some individuals or bands went to Wisconsin or Kansas, but of them there is no question here, for they received land as promised. The treaty with the Menomonees promised Wisconsin lands in return for emigration; the treaty of Buffalo Creek promised Kansas lands for emigration; but the New York Indians did not emigrate, and of the New York lands the Government of the United States never received from the Indians an acre, and as the Indians did not leave the State the United States has received no substantial benefit from the plaintiffs and no money value whatever.
When it is remembered (and this must be remembered) that the United States did not acquire the New York lands, nor wished to do so; that it never was intended (except through Indian emigration westward) that the United States should ever receive anything by way of consideration for the treaty of Buffalo Creek, much of the difficulty which seemed to surround this case disappears.
The land in New York was disposed of through the States of New York and Massachusetts in negotiation with the Indians; in these transactions the United States were in any way only indirectly interested, and not at all financially interested. Tne Indian lands in New York did not come into the possession of the United States under the treaty of 1838 or otherwise, and it was never intended that they should do so.
The Buffalo Creek treaty has vanished, leaving no rights or duties behind it in so far as this litigation is concerned. It said in substance to the Indians, If you wish to go West notify us and we will take you and provide for you; o.r, to take the other argument, it empowered the President to order the Indians West if he deemed it wise to do so.
*459 The few Indians who wished to go to Kansas were taken there and given their land, npon which they did not care to remain, and no more Indians tried to follow them. The Indians who wished to go to Wisconsin were there given lands as promised.
The whole transaction, set forth in this opinion and in the findings, was simply an endeavor on the part of the United States to move the Indians out of New York, and this endeavor failed for the one reason that the Indians did not wish to go— and they did not go. Except for the slight emigration to Wisconsin and the still slighter one to Kansas, where, in both instances, the Indians received their lands, there was no desire shown to leave New York.
The treaty failed. It was not rescinded; it was not violated; but it did not accomplish its full purpose. It did not remove the tribes West, but it removed as many of the Indians as wished to go — a very insignificant minority.
Perhaps the President had the power and technical right under the treaty of Buffalo Greek to surround the Indians with troops and force them away from their homes against their will, but it was not a power he must use, and it was not a power which the Indians wished him to use.
It can not be doubted that if the plaintiffs in this action really wished to avail themselves of the treaty grants the Washington Government would have heartily aided a westward emigration, thus clearing for settlement by the approaching immigrant the fertile lands of central New York. But the Government was not prepared to resort to harsh measures, or, against his will, to drive the Indian from his home, so it made a bargain with him in 1838, and that bargain it fulfilled in moving the Hogeboom party, for in doing this it moved all the Indians who then or since (so far as is shown) have ever wished to leave New York for the Kansas lands.
This is not a case in which the Indian has been harshly treated, where his rights have been invaded, or where he has been sacrificed to the Caucasian. On the contrary, he appears to have received the greatest forbearance; in the face of advancing white settlement he has been allowed by the United States to make his own terms with the States and with the land companies or their representatives or assignees, and he has been allowed to remain at home, while provision was made *460 both in Wisconsin and Kansas for his removal westward had he wished to leave New York.
As to the character of the transactions which led to the sale of the lands in New York we have nothing to do further than to note that the United States Government was not a party to them except in one case, where it in terms affirmed an arrangement made with Ogden and Fellowes (acting under State authority) by the Indians.
We have no reason to doubt that the United States took to Kansas all the Indians who wished to go there, and thus substantially fulfilled their share of the contract. Some Indians went to Wisconsin, as they had a right to do, and there received land as was iiromised. The mass of the Indians remained in New York, as they preferred to do and as they had a right to do, and sold their lands or now remain upon them.
The United States took from the Indians no lands in New York; they offered lands in Wisconsin and Kansas, and so far as the Indians wished it they were moved to those lands and took possession of them.
The purpose of the United States in negotiating the treaty of Buffalo Creek has substantially failed, but plaintiffs have not been injured by that failure, for the Government (it seems to us) has fulfilled any obligation imposed upon it by the treaties with the New York Indians, so far as the Indians permitted. The whole transaction has been for many years closed; there is shown in this record no reason for reopening it.
Upon the whole case it appears to us that the Indians did not desire to go to Kansas; that the United States did not wish to enforce an emigration, and both parties remained quiescent until the Government decided to appropriate the Kansas lands and to sell it to white settlers. When this had been done the defendants, by their own act, became unable to fulfill any financial obligations imposed upon them by the treaty of Buffalo Creek, but as the Indians had no wish that these obligations should be fulfilled — on the contrary, were much averse to their fulfillment and preferred the then existing situation — no damage to either side can be said to have been inflicted. This conclusion, if it be correct, eliminates the treaty of 1838 from the discussion and brings us to a consideration of the relations and obligations of the parties prior to the conclusion of that agreement.
*461 So far as this action is concerned the rights of the Indians prior to tbe treaty of 1838 were fixed and defined by the treaty with the Menomonees dated February 8,1831. (7 Stat. L., 342.)
One of the considerations of the treaty was stated in the preamble to be to settle “ the long-existing dispute between themselves and the several tribes of the New York Indians, who claim to have purchased a portion of their lands;” and the following provisions iipon that subject are found in the instrument:
The Menomonees protest—
“That they are under no obligation to recognize any claim of the New York Indians to any portion of their country; that they neither sold, nor received any value, for the land claimed by these tribes; yet, at the solicitation of their Great Father, the President of the United States, and as an evidence of their love and veneration for him, they agree that such part of the land described, being within the following boundaries, as he may direct, maybe set apart as a home to tbe several tribes of the New York Indians, who may remove to, and settle upon the same, within three years from the date of' this agreement, viz: [Here is a description of the New York Indian land, as well as of land for a military reservation, etc.] The country hereby ceded to the United States, for the benefit of the New York Indians, contains by estimation about five hundred thousand acres, and includes all their improvements on the west side of the Fox River. As it is intended for a home for the several tribes of the New York Indians who may be residing upon the lands at the expiration of three years from this date, and for none others, the President of the United States is hereby empowered to apportion the lands among the actual occupants at that time, so as not to assign to any tribe a greater number of acres than may be equal to 100 for each soul actually settled upon the lands, and if, at the time of such apportionment, any lands shall remain unoccupied by any tribe of the New York Indians, such portion as would have belonged to said Indians, had it been occupied, shall revert to the United States; that portion, if any, so reverting to be laid off by the President of the United States. It is distinctly understood that the lands hereby ceded to the United States for the New York Indians are to be held by those tribes under such tenure as the Menomonee Indians now hold their lands, subject to such regulations and alteration of tenure as Congress and the President of the United States shall, from time to time, think proper to adopt.”
For this cession the United States, “for the benefit of the New York Indians,” “consented” to pay to the Menomonees $20,000, in four installments of $5,000 each.
*462 In the sixth article of the same treaty (with the Menoinonees, 1831; 7 Stat. L., 342) the Menomonee chiefs request the President that such part of the treaty as relates to the New York Indians—
“Be immediately submitted to the representatives of their tribes. And if they refuse to accept the provision made for their benefit, and to remove upon the lands set apart for them on the wes fc side of the Fox River, that he will direct their immediate removal from the Menomonee country; but if they agree to accept of the liberal offer made to them by the parties to this compact, then the Menomonee tribe, as dutiful children of their Great Father, the President, will take them by the hand as brothers, and settle down with them in peace and friendship.”
An article supplementary to this treaty was agreed to by the United States and the Menomonees, February 17,1831 (7 Stat. L346), the preamble of which states that it has been represented—
“ That it would be more desirable and satisfactory to some of those interested that one or two immaterial changes be made in the first and sixth articles, so as not to limit the number of acres to 100 for each soul that may be settled upon the land when the President apportions it, as also to make unlimited the time of removal and settlement upon these lands by the New York Indians, but to leave both these matters discretionary with the President of the United States.”
To accomplish these objects the first article provides that such part of the first article of the treaty of February 8,1831, as limits the removal and settlement of the New York Indians upon the Wisconsin lands shall be altered and amended so as to read as follows:
“That the President of the United States shall prescribe the time for the removal and settlement of the New York Indians upon the lands thus provided for them; and at the expiration of such reasonable time he shall apportion the land among the actual settlers in such manner as he shall deem equitable and just. And if within such reasonable time as the President of the United States shall prescribe for that purpose the New York Indians shall refuse to accept the provisions for their benefit, or, having agreed, shall neglect or refuse to remove from New York and settle on said lands within the time prescribed for that purpose, that then, and in either of these events, the lands aforesaid shall be and remain the property of the United States, according to said first article, excepting so much thereof as the President shall deem justly due to such of the New York Indians as shall actually have *463 removed to and settled on tbe said lands. Second, it is further agreed that tbe part of tbe sixth article of tbe agreement aforesaid which requires tbe removal of those of the New York Indians who may not be settled on the lands at the end of three years shall be so amended as to leave such removal discretionary with the President of the United States, the Menomonee Indians having full confidence that in making his decision he will take into consideration the welfare and prosperity of their nation.” (See also note on p. 347,7 Stat. L.)
This, then, opened the Menomonee lands to New York Indian settlement during the pleasure of the President, and some of the New York Indians have settled there.'
The situation as to the Wisconsin lands does not seem to us to differ in principle from that of the Kansas lands. They were opened to the defendant Indians for a small money consideration paid by the United States to the Menomonees. Some New York Indians went there, took up the lands, and lived there. The others were free to go, but did not wish to do so; in fact, so averse were they to such an emigration that the Government was led to the endeavor to move them to Kansas, formulated in the treaty of Buffalo Creek, which attempt also failed, leaving the Indians in the State of New York, where most of them are to-day. The Indians who went to Wisconsin, equally with the few who went to Kansas, received the land promised them; the others preferred to remain at home •and sell their New York lands.
There is no reason to apply in this case with any strictness the general principles governing the relations of guardian and ward, which usually much affect the decision of cases between the Indian tribes and the Government, for the plaintiffs herein have been treated with kindness and consideration, and have in no way been injured or disturbed in their rights and privileges.
Petition dismissed.