# FEDERAL POWER COMMISSION v. TUSCARORA INDIAN NATION.

No. 63.   Argued December 7, 1959.—Decided March 7, 1960.*

---

*Together with No. 66, *Power Authority of the State of New York* v. *Tuscarora Indian Nation,* also on certiorari to the same Court.

*Solicitor General Rankin* argued the cause for petitioner in No. 63. With him on the brief were *Assistant Attorney General Doub, Samuel D. Slade, Lionel Kestenbaum, Willard W. Gatchell, John C. Mason, Leonard D. Eesley* and *Joseph B. Hobbs.*

*Thomas F. Moore, Jr.* argued the cause for petitioner in No. 66. With him on the brief were *Samuel I. Rosenman, Frederic P. Lee* and *John R. Davison.*

*Arthur Lazarus, Jr.* argued the causes for respondent. With him on the brief was *Eugene Gressman.*

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

The ultimate question presented by these cases is whether certain lands, purchased and owned in fee simple by the Tuscarora Indian Nation and lying adjacent to a natural power site on the Niagara River near the town of Lewiston, New York, may be taken for the storage reservoir of a hydroelectric power project, upon the payment of just compensation, by the Power Authority of the State of New York under a license issued to it by the Federal Power Commission as directed by Congress in Public Law 85–159, approved August 21, 1957, 71 Stat. 401.

The Niagara River, an international boundary stream and a navigable waterway of the United States, flows from Lake Erie to Lake Ontario, a distance of 36 miles. Its mean flow is about 200,000 cubic feet per second. The river drops about 165 feet at Niagara Falls and an additional 140 feet in the rapids immediately above and below the falls. The "head" created by these great falls, combined with the large and steady flow of the river, makes the Lewiston power site, located below the rapids, an extremely favorable one for hydroelectric development.

For the purpose of avoiding "continuing waste of a great natural resource and to make it possible for the United States of America and Canada to develop, for the benefit of their respective peoples, equal shares of the waters of the Niagara River available for power purposes," the United States and Canada entered into the Treaty of February 27, 1950,[1] providing for a flow of 100,000 cubic feet per second over Niagara Falls during certain specified daytime and evening hours of the tourist season (April 1 to October 31) and of 50,000 cubic feet per second at other times, and authorizing the equal division by the United States and Canada of all excess waters for power purposes.[2]

In consenting to the 1950 Treaty, the Senate imposed the condition that "no project for redevelopment of the United States' share of such waters shall be undertaken until it be specifically authorized by Act of Congress." 1 U. S. T. 694, 699. To that end, a study was made and reported to Congress in 1951 by the United States Army Corps of Engineers respecting the most feasible plans for utilizing all of the waters available to the United States under the 1950 Treaty, and detailed plans embodying other studies were prepared and submitted to Congress prior to June 7, 1956, by the Bureau of Power of the Federal Power Commission, the Power Authority of New

---

[1] 1 U. S. T. 694.

[2] The excess flow of water available for power purposes under the 1950 Treaty was estimated to fluctuate between 44,000 and 210,000 cubic feet per second, depending on the flow, the time of year, and the time of day. S. Rep. No. 539, 85th Cong., 1st Sess., p. 4.

The 1950 Treaty superseded the Boundary Waters Treaty of January 11, 1909 (Treaty Series 548, 36 Stat. 2448) which limited diversions of water by Canada to 36,000, and by the United States to 20,000, cubic feet per second. Beginning in 1921, the waters available to the United States under that treaty were utilized by Niagara Mohawk Power Corporation in its Schoellkopf hydroelectric plant, under a federal license expiring in 1971. The rated capacity of that plant was 360,000 kilowatts.

York, and the Niagara Mohawk Power Corporation.[3]   To enable utilization of all of the United States' share of the Niagara waters by avoiding waste of the nighttime and week-end flow that would not be needed at those times for the generation of power, all of the studies and plans provided for a pumping-generating plant to lift those waters at those times into a reservoir, and for a storage reservoir to contain them until released for use—through the pumping-generating plant, when its motors (operating in reverse) would serve as generators—during the daytime hours when the demand for power would be highest and the diversion of waters from the river would be most restricted by the treaty.   Estimates of dependable capacity of the several recommended projects varied from 1,240,000 to 1,723,000 kilowatts, and estimates of the needed reservoir capacity varied from 22,000 acre-feet covering 850 acres to 41,000 acre-feet covering 1,700 acres. The variations in these estimates were largely due to differing assumptions as to the length of the daily period of peak demand.

Although there was "no controversy as to the most desirable engineering plan of development," [4] there was serious disagreement in Congress over whether the project should be publicly or privately developed and over marketing preferences and other matters of policy.   That disagreement continued through eight sessions of Committee Hearings, during which more than 30 proposed bills were considered, in the Eighty-first to Eighty-fifth Congresses,[5] and delayed congressional authorization of the project for seven years.

[3] S. Rep. No. 539, 85th Cong., 1st Sess., pp. 5–6.

[4] *Ibid.*

[5] Hearings were held before the Senate Committee on Public Works, or its Subcommittee, in the Eighty-second, Eighty-third and Eighty-fourth Congresses, and in the first session of the Eighty-fifth Congress; before the House Committee on Public Works in the first

On June 7, 1956, a rock slide destroyed the Schoellkopf plant.[6]   This created a critical shortage of electric power in the Niagara community.   It also required expansion of the plans for the Niagara project if the 20,000 cubic feet per second of water that had been reserved for the Schoellkopf plant was to be utilized.   Accordingly, the Power Authority of New York prepared and submitted to Congress a major revision of the project plans.   Those revised plans, designed to utilize all of the Niagara waters available to the United States under the 1950 Treaty, provided for an installed capacity of 2,190,000 kilowatts, of which 1,800,000 kilowatts would be dependable power for 17 hours per day, necessitating a storage reservoir of 60,000 acre-feet capacity covering about 2,800 acres.[7]

---

sessions of the Eighty-first and Eighty-second Congresses, and in the first and second sessions of the Eighty-fourth Congress.   Joint hearings were held by the House Committee and a Subcommittee of the Senate Committee in the Eighty-third Congress, first session.   Reports on these bills were S. Rep. No. 2501, 83d Cong., 2d Sess.; H. R. Rep. No. 713, 83d Cong., 1st Sess.; S. Rep. No. 1408, 84th Cong., 2d Sess.; H. R. Rep. No. 2635, 84th Cong., 2d Sess.   The Committee Reports on the bill which was finally enacted were S. Rep. No. 539, 85th Cong., 1st Sess.; H. R. Rep. No. 862, 85th Cong., 1st Sess.

   [6] See note 2.

   [7] The Report of the Senate Committee on Public Works of June 27, 1957, reporting out the bill that was finally adopted, contained the following statement:

"The proposals by the Power Authority of the State of New York at present contemplate a project with a total installed capacity of 2,190,000 kilowatts.   Of this 1,800,000 will constitute firm power on a 17-hour-day basis.   They anticipate that in order to achieve this amount of firm capacity pump-storage and pumping-generating facilities will be required."   S. Rep. No. 539, 85th Cong., 1st Sess., p. 5.

   The Report of the House Committee on Public Works of July 23, 1957, contained the following statement:

"As a result of the [Schoellkopf] disaster, the redevelopment project will be enlarged so as to develop the water formerly utilized in the destroyed plant.   The proposal now contemplates a project

Confronted with the destruction of the Schoellkopf plant and the consequent critical need for electric power in the Niagara community, Congress speedily composed its differences in the manner and terms prescribed in Public Law 85–159, approved August 21, 1957. 71 Stat. 401. By § 1(a) of that Act, Congress "expressly authorized and directed" the Federal Power Commission "to issue a license to the Power Authority of the State of New York for the construction and operation of a power project with capacity to utilize all of the United States share of the water of the Niagara River permitted to be used by international agreement." By § 1 (b) of the Act, the Federal Power Commission was directed to "include among the licensing conditions, in addition to those deemed necessary and required under the terms of the Federal Power Act," seven conditions which are of only collateral importance here.[8] The concluding section of the Act, § 2, provides: "The license issued under the terms

with a total installed capacity of 2,190,000 kilowatts. Of this 1,800,000 will constitute firm power on a 17-hour-day basis. It is anticipated that in order to achieve this amount of firm capacity, pump-storage and pumping-generating facilities will be required." H. R. Rep. No. 862, 85th Cong., 1st Sess., p. 7.

[8] Those seven conditions resolved the previously disputed issues which had so long delayed congressional authorization of the project. By those conditions, at least 50% of the project power must be made available to public bodies and nonprofit cooperatives "at the lowest rates reasonably possible," and 20% of that amount must be made available for use in neighboring States. Niagara Mohawk Power Corporation was given the right to purchase 445,000 kilowatts for a designated period to supply, and "restore low power costs to," the customers of its Schoellkopf plant, in exchange for relinquishment of its federal license. The Power Authority of New York was authorized to construct independent transmission lines to reach its preference customers and to control the resale rates of distributors purchasing power from it. The project was required to bear the United States' share of the cost of remedial works in the river, and, within a designated maximum sum, the cost of a scenic drive and a park.

of this Act shall be granted in conformance with Rules of Practice and Procedure of the Federal Power Commission, but in the event of any conflict, the provisions of this Act shall govern in respect of the project herein authorized."

Thereafter, the Power Authority of the State of New York, a municipal corporation created under the laws of that State to develop the St. Lawrence and Niagara power projects, applied to the Federal Power Commission for the project license which Congress had thus directed the Commission to issue to it. Its application embraced the project plans that it had submitted to the Eighty-fifth Congress shortly before its approval of Public Law 85–159.[9] The project was scheduled to be completed in 1963 at an estimated cost of $720,000,000.

Hearings were scheduled by the Commission, of which due notice was given to all interested parties, including the Tuscarora Indian Nation, inasmuch as the application contemplated the taking of some of its lands for the reservoir. The Tuscarora Indian Nation intervened and objected to the taking of any of its lands upon the ground "that the applicant lacks authority to acquire them." At the hearings, it was shown that the Tuscarora lands needed for the reservoir—then thought to be about 1,000 acres— are part of a separate tract of 4,329 acres purchased in fee simple by the Tuscarora Indian Nation, with the assistance of Henry Dearborn, then Secretary of War, from the Holland Land Company on November 21, 1804, with the

---

[9] The plans embraced by the application for the license consisted, in general, of (1) the main generating plant on the east bank of the river, (2) a pumping-generating plant, located a short distance east of the main generating plant, (3) a storage reservoir, adjacent to the pumping-generating plant, having a usable storage capacity of 60,000 acre-feet, and covering about 2,800 acres, (4) a water intake structure on the east bank of the river about three miles above the falls, and (5) a water conveyance system extending from the intake to a forebay at the pumping-generating plant, and from the latter to a forebay at the main generating plant.

proceeds derived from the contemporaneous sale of their lands in North Carolina—from which they had removed in about the year 1775 to reside with the Oneidas in central New York.[10]

After concluding the hearings, the Commission, on January 30, 1958, issued its order granting the license. It found that a reservoir having a usable storage capacity of 60,000 acre-feet "is required to properly utilize the water resources involved." Although the Commission found that the Indian lands "are almost entirely unde-

---

[10] Because the proceeds of the sale of the Tuscaroras' North Carolina lands ($15,000) were payable in three equal annual installments and were to be used, so far as necessary, for the payment of the purchase price of the New York lands ($13,752.80), which was also payable in three substantially equal annual installments, the latter lands were conveyed on November 21, 1804, by deed of the Holland Land Company (which acknowledged receipt of the first installment of the purchase price, and reserved a lien to secure the two unpaid installments of the purchase price) to Henry Dearborn "in Trust" for the "Tuscarora Nation of Indians and their Assigns forever . . . the said Henry Dearborn and his Heirs [to] grant and convey the same in Fee Simple or otherwise to such person or persons as the said Tuscarora Nation of Indians shall at any time hereafter direct and appoint." After collection of the remaining installments of the purchase price of the Tuscaroras' North Carolina lands and, in turn, remitting to the Holland Land Company so much thereof as was necessary to pay the balance of the purchase price for the New York lands, Henry Dearborn conveyed the New York lands to the "Tuscarora Nation of Indians and their Successors and Assigns for ever," in fee simple free and clear of encumbrances, on January 2, 1809. The Tuscarora Indian Nation has ever since continued to own those lands under that conveyance.

In addition to the 4,329 acres purchased from the Holland Land Company in 1804, the Tuscaroras' reservation embraces two other contiguous tracts containing 1,920 acres. The first, a tract of 640 acres, was ceded to the Tuscaroras by the Holland Land Company in June 1798. The second, a tract of 1,280 acres, was ceded to them by the Holland Land Company in 1799. Those tracts are not involved in this case.

veloped except for agricultural use," it did not pass upon the Tuscaroras' objection to the taking of their lands because it then assumed that "other lands are available for reservoir use if the Applicant is unable to acquire the Indian lands." But the Commission did direct the licensee to revise its exhibit covering the reservoir, to more definitely show the area and acreage involved, and to resubmit it to the Commission for approval within a stated time.

In its application for rehearing, the Tuscarora Indian Nation contended, among other things, that the portion of its lands sought to be taken for the reservoir was part of a "reservation," as defined in § 3 (2), and as used in § 4 (e), of the Federal Power Act,[11] and therefore could not lawfully be taken for reservoir purposes in the absence of a finding by the Commission "that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired." By its order of March 21, 1958, denying that application for rehearing, the Commission found that "[t]he best location of the reservoir would require approximately 1,000 acres of land owned by Intervener," and it held that the Indian lands involved "are not part of a 'reservation' referred to in Section 4 (e) as defined in Section 3 (2) of the [Federal Power] Act and the finding suggested by Intervener is not required." On May 5, 1958, the Commission issued its order approving the licensee's revised exhibit which precisely delineated the location, area, and acreage to be embraced by the reservoir—which included 1,383 acres of the Tuscaroras' lands.

On May 16, 1958, the Tuscarora Indian Nation filed a petition for review in the Court of Appeals for the District of Columbia Circuit challenging the license issued by the Commission on January 30, 1958, insofar as it

---

[11] As amended, 49 Stat. 838, 16 U. S. C. §§ 796 (2) and 797 (e).

would authorize the taking of Tuscarora lands.[12]   By its opinion and interim judgment of November 14, 1958, the Court of Appeals held that the Tuscarora lands sought to be taken for the reservoir constitute a part of a "reser-

---

[12] Meanwhile, on April 15, 1958, the Power Authority of New York commenced so-called "appropriation" proceedings under § 30 of the New York State Highway Law, McKinney's Consol. Laws, c. 25, and also under Art. 5, Tit. 1, of the New York Public Authorities Law, McKinney's Consol. Laws, c. 43–A, to condemn the 1,383 acres of Tuscarora lands for reservoir use.

On April 18, 1958, the Tuscarora Indian Nation filed a complaint in the United States District Court for the Southern District of New York against the Power Authority and the Superintendent of Public Works of New York, seeking (1) a declaratory judgment that the Power Authority had no right or power to take any of its lands without the express and specific consent of the United States, and (2) a permanent injunction against the appropriation or condemnation of any of its lands.  The court issued a temporary restraining order.  The action, being a "local" one, was then transferred to the District Court for the Western District of New York.  After hearing, that court on June 24, 1958, denied the relief prayed, dissolved the restraining order, and dismissed the complaint on the merits.  *Tuscarora Nation of Indians* v. *Power Authority of the State of New York,* 164 F. Supp. 107.

On appeal, the Second Circuit affirmed in part and reversed in part.  It held that the Power Authority was authorized under Public Law 58–159 and the Federal Power Act and by the Commission's license thereunder of January 30, 1958, to take the part of the Tuscarora lands needed for the reservoir, but that they could be taken only by a condemnation action in a state or federal court in the district where the property is located under and in the manner provided by § 21 of the Federal Power Act (16 U. S. C. § 814), and not by "appropriation" proceedings under the New York laws referred to.  *Tuscarora Nation of Indians* v. *Power Authority of the State of New York,* 257 F. 2d 885.  The Tuscarora Indian Nation's petition to this Court for a writ of certiorari was denied on October 13, 1958.  358 U. S. 841.  The Superintendent of Public Works of New York, a respondent in the Second Circuit proceedings, has appealed to this Court from so much of the judgment as denied a right to acquire the Tuscarora lands by appropriation proceedings under the New York laws, and that appeal is now pending here.  (No. 4, Oct. Term, 1959.)

vation" within the meaning of §§ 3 (2) and 4 (e) of the Federal Power Act, and that the Commission may not include those lands in the license in the absence of a § 4 (e) finding that their taking "will not interfere or be inconsistent with the purpose for which such reservation was created or acquired," and the court remanded the case to the Commission that it might "explore the possibility of making that finding." 105 U. S. App. D. C. 146, 265 F. 2d 338.

Upon remand, the Commission held extensive hearings, exploring not only the matter of the making of the finding held necessary by the Court of Appeals but also the possibility of locating the reservoir on other lands. In its order of February 2, 1959, the Commission found that the use of other lands for the reservoir would result in great delay, severe community disruption, and unreasonable expense; that a reservoir with usable storage capacity of 60,000 acre-feet is required to utilize all of the United States' share of the water of the Niagara River, as required by Public Law 85–159; that removal of the reservoir from the Tuscarora lands by reducing the area of the reservoir would reduce the usable storage capacity from 60,000 acre-feet to 30,000 acre-feet and result in a loss of about 300,000 kilowatts of dependable capacity. But it concluded that, although other lands contiguous to their reservation might be acquired by the Tuscaroras,[13]

---

[13] In making the statement referred to in the text the Commission was doubtless alluding to the fact that in May 1958, the Power Authority offered the Tuscaroras $1,500,000 for the 1,383 acres, or in excess of $1,000 per acre, plus payment for, or removal to or replacing on other lands, the 37 houses located on these 1,383 acres and offered to construct for them a community center building, involving a total expenditure of about $2,400,000, which offer, the Commission says, has never been withdrawn.

The Tuscarora Indian Nation tells us in its brief that:

"What the Government unfortunately fails to point out is that the Power Authority's 'offer' was and still is an empty gesture since, as

the taking of the 1,383 acres of Tuscarora lands for the reservoir "would interfere and would be inconsistent with the purpose for which the reservation was created or acquired." That order was transmitted to the Court of Appeals which, on March 24, 1959, after considering various motions of the parties, entered its final judgment approving the license except insofar as it would authorize the taking of Tuscarora lands for the reservoir, and remanded the case to the Commission with instructions to amend the license "to exclude specifically the power of the said Power Authority to condemn the said lands of the Tuscarora Indians for reservoir purposes." 105 U. S. App. D. C., at 152, 265 F. 2d, at 344.

Because of conflict between the views of the court below and those of the Second Circuit, and of the general importance of the questions involved, we granted certiorari. 360 U. S. 915.

The parties have urged upon us a number of contentions, but we think these cases turn upon the answers to two questions, namely, (1) whether the Tuscarora lands covered by the Commission's license are part of a "reservation" as defined and used in the Federal Power Act, 16 U. S. C. § 791a *et seq.*, and, if not, (2) whether those lands may be condemned by the licensee, under the eminent domain powers conferred by § 21 of the Federal Power Act, 16 U. S. C. § 814. We now turn to a consideration of those questions in the order stated.

## I.

A Commission finding that "the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired" is required by § 4 (e)

the court below and the Court of Appeals for the Second Circuit both ruled, the Tuscarora Nation is prohibited by law from selling its lands without the consent of the United States expressed in an act of Congress. 25 U. S. C. §§ 177, 233."

of the Federal Power Act, 16 U. S. C. § 797 (e), only if the lands involved are within a "reservation" in the sense of that term as defined and used in that Act. That by generally accepted standards and common understanding these Tuscarora lands may be part of a "reservation" is not at all decisive of whether they are such within the meaning of the Federal Power Act. Congress was free and competent artificially to define the term "reservations" for the purposes it prescribed in that Act. And we are bound to give effect to its definition of that term, for it would be idle for Congress to define the sense in which it used it "if we were free in despite of it to choose a meaning for ourselves." *Fox* v. *Standard Oil Co.*, 294 U. S. 87, 96. By § 3 (2) of the Federal Power Act, 16 U. S. C. § 796 (2), Congress has provided:

"SEC. 3. The words defined in this section shall have the following meanings for purposes of this Act, to wit:

.     .     .     .     .

"(2) 'reservations' means national forests, tribal lands embraced within Indian reservations, military reservations, and *other* lands and interests in lands *owned by the United States,* and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purpose; but shall not include national monuments or national parks." (Emphasis added.)

The plain words of this definition seem rather clearly to show that Congress intended the term "reservations," wherever used in the Act, to embrace only "lands and interests in lands owned by the United States."

Turning to the definition's legislative history, we find that it, too, strongly indicates that such was the congressional intention. In the original draft bill of the Federal

Water Power Act of 1920, as proposed by the Administration and passed by the House in the Sixty-fifth and Sixty-sixth Congresses, the term was defined as follows:

" 'Reservations' means lands and interest in lands owned by the United States and withdrawn, reserved, or withheld from private appropriation and disposal under the public-land laws, and lands and interest in lands acquired and held for any public purpose." [14]

It is difficult to perceive how congressional intention could be more clearly and definitely expressed. However, after the bill reached the Senate it inserted the words "national monuments, national parks, national forests, tribal lands embraced within Indian reservations, military reservations, *and other*" (emphasis added) at the beginning of the definition.[15] When the bill was returned to the House it was explained that the Senate's "amendment recasts the House definition of 'reservations.' " [16] The bill as enacted contained the definition as thus recast. It remains in that form, except for the deletion of the words "national monuments, national parks," which was occasioned by the Act of March 3, 1921 (41 Stat. 1353), negating Commission authority to license any project works within "national monuments or national parks," and those words were finally deleted from the definition by amendment in 1935. 49 Stat. 838. It seems entirely clear that no change in substance was intended or effected by the Senate's amendment, and that its "recasting" only specified, as illustrative, some of the "reservations" on "lands and interests in lands owned by the United States."

Further evidence that Congress intended to limit "reservations," for the "purposes of this Act" (§ 3), to those

---

[14] See H. R. Rep. No. 715, 65th Cong., 2d Sess., p. 22; S. Rep. No. 180, 66th Cong., 1st Sess., p. 10.

[15] See S. Rep. No. 180, 66th Cong., 1st Sess., p. 10; 59 Cong. Rec. 1103.

[16] See H. R. Rep. No. 910, 66th Cong., 2d Sess., p. 7.

located on "lands owned by the United States" or in which it owns an interest is furnished by its use of the term in the context of § 4 (e) of the Act. By that section Congress, after authorizing the Commission to license projects in streams or other bodies of water over which it has jurisdiction under the *Commerce Clause* of the Constitution (Art. I, § 8, cl. 3), authorized the Commission to license projects "upon any part of the public lands and reservations of the United States." Congress must be deemed to have known, as this Court held in *Federal Power Comm'n* v. *Oregon,* 349 U. S. 435, 443, that the licensing power, "in relation to public lands and reservations of the United States springs from the Property Clause" of the Constitution—namely, the ". . . Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." Art. IV, § 3, cl. 2. In thus acting under the Property Clause of the Constitution, Congress must have intended to deal only with "the Territory or other Property belonging to the United States." *Ibid.*

Moreover, the Federal Power Act's plan of compensating for lands taken or used for licensed projects is explicable only if the term "reservations" is confined, as Congress evidently intended, to those located on "lands owned by the United States" or in which it owns a proprietary interest. By § 21, 16 U. S. C. § 814, licensees are authorized to *acquire* "the lands or property of others necessary to the" licensed project "by the exercise of the right of eminent domain" in the federal or state courts, and, of course, upon the payment of just compensation. But, despite its general and all-inclusive terms, § 21 does not apply to nor authorize condemnation of lands or interests in lands owned by the United States, because § 10 (e) of the Act, 16 U. S. C. § 803 (e), expressly provides that "the licensee shall pay to the United States reasonable annual charges . . . for recompensating *it* for

the *use, occupancy, and enjoyment* of *its* lands or other property" (emphasis added) devoted to the licensed project. It therefore appears to be unmistakably clear that by the language of the first proviso of that section saying, in pertinent part, "That when licenses are issued involving the use of Government dams or other structures owned by the United States or *tribal lands embraced within Indian reservations* (these italicized words being lifted straight from the § 3 (2) definition of 'reservations') the Commission shall . . . fix a reasonable annual charge for the use thereof . . . ," Congress intended to treat and treated only with structures, lands and interests in lands owned by the United States, for, as stated, the section expressly requires the "reasonable annual charges" to be paid to the *United States* for the use, occupancy, and enjoyment of *"its lands or other property."* (Emphasis added.)

This analysis of the plain words and legislative history of the Act's definition of "reservations" and of the plan and provisions of the Act leaves us with no doubt that Congress, "for purposes of this Act" (§ 3 (2)), intended to and did confine "reservations," including "tribal lands embraced within Indian reservations" (§ 3 (2)), to those located on lands "owned by the United States" (§ 3 (2)), or in which it owns a proprietary interest.

The Court of Appeals did not find to the contrary. Indeed, it found that the Act's definition of "reservations" includes only those located on lands in which the United States "has an interest." But it thought that the national paternal relationship to the Indians and the Government's concern to protect them against improper alienation of their lands gave the United States the requisite "interest" in the lands here involved, and that the result "must be the same as if the phrase 'owned by the United States, [etc.]' were not construed as a limitation upon the term 'tribal lands [etc.].'" 105 U. S. App.

D. C., at 150, 265 F. 2d, at 342. We do not agree. The national "interest" in Indian welfare and protection "is not to be expressed in terms of property . . . ." *Heckman* v. *United States,* 224 U. S. 413, 437. The national "paternal interest" in the welfare and protection of Indians is not the "interests in lands *owned* by the United States" required, as an element of "reservations," by § 3 (2) of the Federal Power Act. (Emphasis added.)

Inasmuch as the lands involved are owned in fee simple by the Tuscarora Indian Nation and no "interest" in them is "owned by the United States," we hold that they are not within a "reservation" as that term is defined and used in the Federal Power Act, and that a Commission finding under § 4 (e) of that Act "that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired" is not necessary to the issuance of a license embracing the Tuscarora lands needed for the project.

## II.

We pass now to the question whether the portion of the Tuscarora lands here involved may be condemned by the licensee under the provisions and eminent domain powers of § 21 of the Federal Power Act. Petitioners contend that § 21 is a broad general statute authorizing condemnation of "the lands or property of others necessary to the construction, maintenance, or operation of any" licensed project, and that lands owned by Indians in fee simple, not being excluded, may be taken by the licensee under the federal eminent domain powers delegated to it by that section. Parrying this contention, the Tuscarora Indian Nation argues that § 21, being only a general Act of Congress, does not apply to Indians or their lands.

The Tuscarora Indian Nation heavily relies upon *Elk* v. *Wilkins,* 112 U. S. 94. It is true that in that case the

Court, dealing with the question whether a native-born American Indian was made a citizen of the United States by the Fourteenth Amendment of the Constitution, said: "Under the Constitution of the United States, as originally established . . . General Acts of Congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them." 112 U. S., at 99–100. However that may have been, it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests. In *Superintendent of Five Civilized Tribes* v. *Commissioner*, 295 U. S. 418, the funds of a restricted Creek Indian were held and invested for him by the Superintendent, and a question arose as to whether income from the investment was subject to federal income taxes. In an earlier case, *Blackbird* v. *Commissioner*, 38 F. 2d 976, the Tenth Circuit had held such income to be exempt from federal income taxation. But in this case the Board of Tax Appeals sustained the tax, the Tenth Circuit affirmed, and the Superintendent brought the case here. This Court observed that in the *Blackbird* case the Tenth Circuit had said that to hold a general act of Congress to be applicable to restricted Indians "would be contrary to the almost unbroken policy of Congress in dealing with its Indian wards and their affairs. Whenever they and their interests have been the subject affected by legislation they have been named and their interests specifically dealt with." That is precisely the argument now made here by the Tuscarora Indian Nation. But this Court, in affirming the judgment, said:

> "This does not harmonize with what we said in *Choteau* v. *Burnet* (1931), 283 U. S. 691, 693, 696:
> " 'The language of [the Internal Revenue Act of 1918] subjects the income of "every individual" to tax. Section 213 (a) includes income "from any

source whatever." The intent of Congress was to levy the tax with respect to all residents of the United States and upon all sorts of income. The Act does not expressly exempt the sort of income here involved, nor a person having petitioner's status respecting such income, and we are not referred to any other statute which does. . . . The intent to exclude must be definitely expressed, where, as here, the language of the Act laying the tax is broad enough to include the subject matter.'

"The court below properly declined to follow its quoted pronouncement in Blackbird's case. The terms of the 1928 Revenue Act are very broad, and nothing there indicates that Indians are to be excepted. See *Irwin* v. *Gavit,* 268 U. S. 161; *Heiner* v. *Colonial Trust Co.,* 275 U. S. 232; *Helvering* v. *Stockholms Enskilda Bank,* 293 U. S. 84; *Pitman* v. *Commissioner,* 64 F. (2d) 740. The purpose is sufficiently clear." 295 U. S., at 419–420.

In *Oklahoma Tax Comm'n* v. *United States,* 319 U. S. 598, this Court, in holding that the estate of a restricted Oklahoma Indian was subject to state inheritance and estate taxes under general state statutes, said:

"The language of the statutes does not except either Indians or any other persons from their scope. [319 U. S., at 600.] If Congress intends to prevent the State of Oklahoma from levying a general non-discriminatory estate tax applying alike to all its citizens, it should say so in plain words. Such a conclusion cannot rest on dubious inferences." 319 U. S., at 607.

See, *e. g.,* *Shaw* v. *Gibson-Zahniser Oil Corporation,* 276 U. S. 575, 581–582; *United States* v. *Ransom,* 263 U. S. 691; *Kennedy* v. *Becker,* 241 U. S. 556, 563–564; *Choate* v. *Trapp,* 224 U. S. 665, 673.

The Federal Power Act constitutes a complete and comprehensive plan for the development and improvement of navigation and for the development, transmission and utilization of electric power in any of the streams or other bodies of water over which Congress has jurisdiction under its commerce powers, and upon the public lands and reservations of the United States under its property powers. See § 4 (e). It neither overlooks nor excludes Indians or lands owned or occupied by them. Instead, as has been shown, the Act specifically defines and treats with lands occupied by Indians—"tribal lands embraced within Indian reservations." See §§ 3 (2) and 10 (e). The Act gives every indication that, within its comprehensive plan, Congress intended to include lands owned or occupied by any person or persons, including Indians. The Court of Appeals recognized that this is so. 105 U. S. App. D. C., at 151, 265 F. 2d, at 343. Section 21 of the Act, by broad general terms, authorizes the licensee to condemn "the lands or property of others necessary to the construction, maintenance, or operation of any" licensed project. That section does not exclude lands or property owned by Indians, and, upon the authority of the cases cited, we must hold that it applies to these lands owned in fee simple by the Tuscarora Indian Nation.

The Tuscarora Indian Nation insists that even if its lands are embraced by the terms of § 21 of the Federal Power Act, they still may not be taken for public use "without the express consent of Congress referring specifically to those lands," because of the provisions of 25 U. S. C. § 177.[17] That section, in pertinent part, provides:

> "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any

---

[17] The Tuscaroras also rely upon 25 U. S. C. § 233, which confers, subject to qualifications, jurisdiction upon the courts of New York over civil actions between Indians and also between them and other

Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. . . ."

The obvious purpose of that statute is to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress, and to enable the Government, acting as *parens patriae* for the Indians, to vacate any disposition of their lands made without its consent. See, *e. g., United States* v. *Hellard,* 322 U. S. 363; *United States* v. *Candelaria,* 271 U. S. 432, 441–442; *Henkel* v. *United States,* 237 U. S. 43, 51; *United States* v. *Sandoval,* 231 U. S. 28, 46–48. But there is no such requirement with respect to conveyances to or condemnations by the United States or its licensees; "nor is it conceivable that it is necessary, for the Indians are subject only to the same rule of law as are others in the State . . . ." *United States* v. *Oklahoma Gas Co.,* 318 U. S. 206, 211.

As to the Tuscaroras' contention that § 177 prohibits the taking of any of their lands for the reservoir "without the express and specific consent of Congress," one thing is certain. It is certain that if § 177 is applicable to alienations effected by condemnation proceedings under § 21 of the Federal Power Act, the mere "expressed consent" of Congress would be vain and idle. For § 177 at the very least contemplates *the assent of the Indian nation or tribe.* And inasmuch as the Tuscarora Indian Nation withholds such consent and refuses to convey to the licensee any of its lands, it follows that the mere consent of Congress, however express and specific, would avail

---

persons, and contains a pertinent proviso "That nothing herein contained shall be construed as authorizing the alienation from any Indian nation, tribe, or band of Indians of any lands within any Indian reservation in the State of New York."

nothing. Therefore, if § 177 is applicable to alienations effected by condemnation under § 21 of the Federal Power Act, the result would be that the Tuscarora lands, however imperative for the project, could not be taken at all.

But § 177 is not applicable to the sovereign United States nor, hence, to its licensees to whom Congress has delegated federal eminent domain powers under § 21 of the Federal Power Act. The law is now well settled that:

> "A general statute imposing restrictions does not impose them upon the Government itself without a clear expression or implication to that effect." *United States* v. *Wittek,* 337 U. S. 346, 358–359.

In *United States* v. *United Mine Workers of America,* 330 U. S. 258, 272–273, the Court said:

> "There is an old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect."

See, *e. g., Leiter Minerals, Inc.,* v. *United States,* 352 U. S. 220, 224–225; *United States* v. *Wyoming,* 331 U. S. 440, 449; *United States* v. *Stevenson,* 215 U. S. 190; *United States* v. *American Bell Telephone Co.,* 159 U. S. 548, 553–555; *Lewis* v. *United States,* 92 U. S. 618, 622; *United States* v. *Herron,* 20 Wall. 251, 263; *Dollar Savings Bank* v. *United States,* 19 Wall. 227, 239.

This Court has several times applied, in combination, the rules (1) that general Acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary, and (2) that general statutes imposing restrictions do not apply to the Government itself without a clear expression to that effect. It did so in *Henkel* v. *United States,* 237 U. S. 43 (sustaining the right of the United States to take Indian lands for reservoir purposes under the general Reclamation Act of June 17, 1902, 32 Stat. 388), in *Spalding* v. *Chandler,* 160 U. S.

394 (sustaining the power of the Government to convey a strip of land through a tract owned by an Indian tribe to one Chandler for the use of the State of Michigan in constructing a canal, even though the conveyance was in derogation of a treaty with the Indian tribe), and in *Cherokee Nation* v. *Southern Kansas R. Co.,* 135 U. S. 641. There, this Court sustained the right of a licensee of the Government to take so much of the undescribed fee lands of an Indian tribe as was necessary for the licensed project, though in derogation of the terms of a treaty between the United States and the Indian tribe,[18] saying:

"It would be very strange if the national government, in the execution of its rightful authority, could exer-

_____

[18] The Tuscarora Indian Nation argues that its lands in question should be regarded as subject to and protected from condemnation by the Treaty of Fort Stanwix of October 22, 1784 (7 Stat. 15), the unratified Treaty of Fort Harmar of January 9, 1789 (7 Stat. 33), and the Treaty of Canandaigua of November 11, 1794 (7 Stat. 44). But the record shows that the first two of these treaties related to other lands and, principally at least, to other Indian nations, and that the last treaty mentioned, though covering the lands in question, was with another Indian nation (the Senecas) which, pursuant to the Treaty of Big Tree of September 15, 1797 (7 Stat. 601) and with the approbation of the United States, sold its interest in these lands to Robert Morris and thus freed them from the effects of the Treaty of Canandaigua of 1794. Robert Morris, in turn, conveyed these lands to the Holland Land Company and it, in turn, conveyed the part in question to the Tuscarora Indian Nation, and its title rests upon that conveyance, free of any treaty.

It appears from the record that, as earlier stated (see note 10), the Tuscaroras, save for a few of them who remained on their lands "on the Roanoke" in North Carolina, moved from their North Carolina lands to reside with the Oneidas in central New York—at a point about 200 miles east of the lands now owned by the Tuscaroras in Niagara County, New York—in 1775. The Tuscaroras had no proprietary interest in the Oneidas' lands in central New York but were there as "guests" of the Oneidas or as "tenants at will or by suffer-

cise the power of eminent domain in the several States, and could not exercise the same power in a Territory occupied by an Indian nation or tribe, the members of which were wards of the United States, and directly subject to its political control. The lands in the Cherokee territory, like the lands held by private owners everywhere within the geographical limits of the United States, are held subject to the authority of the general government to take them for such objects as are germane to the execution of the powers granted to it; provided only, that they are not taken without just compensation being made to the owner." 135 U. S., at 656–657.

---

ance." Hough, Census of the State of New York, 1857, p. 510; New York Senate Document No. 24, 1846, p. 68. They came to be recognized, however, as members of the Five Nations which thereafter became known as the Six Nations (the others being the Oneidas, the Mohawks, the Onondagas, the Cayugas and the Senecas). The Senecas occupied a vast area in western New York, including the lands here in question. A few Tuscaroras fought with the Senecas on the side of the British and after their defeat at the battle of Elmira in 1779, they went to reside with the Senecas in the vicinity of Fort Niagara in about 1780. Other Tuscaroras then moved to that place. Just when they did so is not known with certainty and it appears that the most that can be said is that they were there prior to 1797. The Tuscaroras had the same kind of tenure, $i.\ e.$, guests or tenants at will or by sufferance, with the Senecas as they had earlier had with the Oneidas in central New York. One of their chiefs described their situation as "squatters upon the territory of another distinct nation."

By the Treaty of Fort Stanwix of 1784 (7 Stat. 15) and the unratified Treaty of Fort Harmar of 1789 (7 Stat. 33) with the Six Nations, the United States promised to hold the Oneidas and the Tuscaroras secure in the lands upon which they then lived—which were the lands in central New York about 200 miles east of the lands in question. By the same treaties the United States promised to secure to the Six Nations a tract of land in western New York in the vicinity of the Niagara River. By the Treaty of Canandaigua of 1794 (7 Stat. 44) between the United States and the Six Nations, which superseded the prior treaties (except, by Article VI, the United States remained

See also *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 565; *Missouri, Kansas & Texas R. Co.* v. *Roberts,* 152 U. S. 114, 117–118; *Beecher* v. *Wetherby,* 95 U. S. 517; *Kohl* v. *United States,* 91 U. S. 367.

In the light of these authorities we must hold that Congress, by the broad general terms of § 21 of the Federal Power Act, has authorized the Federal Power Commission's licensees to take lands owned by Indians, as well as those of all other citizens, when needed for a licensed project, upon the payment of just compensation; that the lands in question are not subject to any treaty between the United States and the Tuscaroras (see notes 10 and 18); and that 25 U. S. C. § 177 does not apply to the United States itself nor prohibit it, or its licensees under the Federal Power Act, from taking such lands in

---

bound to pay the Tuscaroras $4,500 per year for the purchase of clothing), it was recognized that the Senecas alone had possessory rights to the western New York area here involved and, as a result of that treaty, a large tract of western New York lands, including the lands now owned by the Tuscaroras, was secured to the Senecas.

Under the 1786 Hartford Compact between New York and Massachusetts, New York was recognized to have sovereignty over those lands and Massachusetts to own the underlying fee to those lands and the right to purchase the Senecas' interest in them. In 1794, Massachusetts sold the fee and the right to purchase the Senecas' right to occupy these western New York lands, including the lands now owned by the Tuscaroras, to Robert Morris, who, in turn, sold those lands and rights to the Holland Land Company with the covenant that he would buy out the Senecas' rights of occupancy for and on behalf of the Holland Land Company. And at the Treaty of Big Tree of 1797 (7 Stat. 601), Morris, with the approbation of the United States, purchased the Senecas' rights of occupancy in the lands here in question for the Holland Land Company. Thus the lands in question were entirely freed from the effects of all then existing treaties with the Indians, and the Tuscaroras' title to their present lands derives, as earlier stated, from the Holland Land Company (see note 10 for further details) and has never since been subject to any treaty between the United States and the Tuscaroras.

the manner provided by § 21, upon the payment of just compensation.

All members of this Court—no one more than any other—adhere to the concept that agreements are made to be performed—no less by the Government than by others—but the federal eminent domain powers conferred by Congress upon the Commission's licensee, by § 21 of the Federal Power Act, to take such of the lands of the Tuscaroras as are needed for the Niagara project do not breach the faith of the United States, or any treaty or other contractual agreement of the United States with the Tuscarora Indian Nation in respect to these lands for the conclusive reason that there is none.

*Reversed.*

Mr. Justice Brennan concurs in the result.

Mr. Justice Black, whom The Chief Justice and Mr. Justice Douglas join, dissenting.

The Court holds that the Federal Power Act [1] authorizes the taking of 22% (1,383 acres) of the single tract which the Tuscarora Indian Nation has owned and occupied as its homeland for 150 years.[2] Admittedly this

---

[1] 41 Stat. 1063, as amended, 16 U. S. C. §§ 791a–828c.

[2] While the petitioners have argued that Congress authorized this taking in the 1957 Niagara Power Act, 71 Stat. 401, 16 U. S. C. §§ 836–836a, the Court does not accept this argument. Neither do I. There is absolutely no evidence that Congress was in any way aware that these Tuscarora lands would be required by the Niagara Power Project. The petitioners have also argued that Congress impliedly authorized this taking in the 1957 Act because in fact the Tuscarora lands are indispensable to the Niagara Power Project. But the record shows that the reservation lands are not indispensable. The Federal Power Commission first found that "other lands are available." 19 F. P. C. 186, 188. And see 105 U. S. App. D. C. 146, 151, 265 F. 2d 338, 343. On remand the Commission refused to find that the Indian lands were indispensable, although it did find that use of other

taking of so large a part of the lands will interfere with the purpose for which this Indian reservation was created—a permanent home for the Tuscaroras. I not only believe that the Federal Power Act does not authorize this taking, but that the Act positively prohibits it. Moreover, I think the taking also violates the Nation's long-established policy of recognizing and preserving Indian reservations for tribal use, and that it constitutes a breach of Indian treaties recognized by Congress since at least 1794.

Whether the Federal Power Act permits this condemnation depends, in part, upon whether the Tuscarora Reservation is a "reservation" within the meaning of the Act. For if it is, § 4 (e) forbids the taking of any part of the lands except after a finding by the Federal Power Commission that the taking "will not interfere or be inconsistent with the purpose for which such reservation was created or acquired . . . ." [3] There is no such finding here. In fact, the Commission found that the inundation of so great a part of the Tuscarora Reservation by the waters

---

lands would be much more expensive. 21 F. P. C. 146. And see 21 F. P. C. 273, 275. That other lands are more expensive is hardly proof that the Tuscarora lands are indispensable to this $700,000,000 project.

[3] Section 4 (e) contains the general grant of power for the Federal Power Commission to issue licenses for federal power projects. The part that is of crucial significance here reads:

"[L]icenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation . . . ."

Title 16 U. S. C. § 797 (e), enacted as § 4 (d) in the Federal Water Power Act of 1920, 41 Stat. 1063, was re-enacted in the 1935 amendments, 49 Stat. 838, as § 4 (e) and is referred to as such throughout.

of the proposed reservoir "will interfere and will be inconsistent with the purpose for which such reservation was created or acquired." 21 F. P. C. 146, 148. If these Tuscarora homelands are "tribal lands embraced within" an Indian reservation as used in § 3 (2) [4] they constitute a "reservation" for purposes of § 4 (e), and therefore the taking here is unauthorized because the requisite finding could not be made.

I believe the plain meaning of the words used in the Act, taken alone, and their meaning in the light of the historical background against which they must be viewed, require the conclusion that these lands are a "reservation" entitled to the protections of § 4 (e) of the Act. "Reservation," as used in § 4 (e), is defined by § 3 (2), which provides:

> " 'reservations' means national forests, *tribal lands embraced within Indian reservations,* military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purposes; but shall not include national monuments or national parks . . . ." (Emphasis supplied.)

The phrase "tribal lands embraced within Indian reservations" surely includes these Tuscarora lands. They are tribal lands. They are embraced within the Tuscarora Indian Nation's reservation. The lands have been called a reservation for more than 150 years. They have been so described in treaties, Acts of Congress, court decisions, Indian agency reports, books, articles,

---

[4] Section 3, 16 U. S. C. § 796, is the general definitions section of the Federal Power Act, and was first enacted in the Federal Water Power Act of 1920, 41 Stat. 1063. Section 3 (2) defines the term "reservations."

and maps. In fact, so far as I can ascertain, they have never been called anything else, anywhere or at any time—until today. Even the Court of Appeals and the Federal Power Commission, and the briefs and record in this Court, quite naturally refer to this 10-square-mile tract of land as an Indian reservation. The Court itself seems to accept the fact that the Tuscarora Nation lives on a reservation according to (in its words) the "generally accepted standards and common understanding" of that term.

The Court, however, decides that in the Federal Power Act Congress departed from the meaning universally given the phrase "tribal lands embraced within Indian reservations" and defined the phrase, the Court says, "artificially." The Court believes that the words "other lands . . . owned by the United States," which follow, were intended by Congress to limit the phrase to include only those reservations to which the United States has technical legal title. By the Court's "artificial" interpretation, the phrase turns out to mean "tribal lands embraced within Indian reservations—except when 'the lands involved are owned in fee simple by the [Indians].' "[5]

Creating such a wholly artificial and limited definition, so new and disruptive, imposes a heavy burden of justification upon the one who asserts it. We are told that many tribes own their reservation lands. The well-known Pueblos of New Mexico own some 700,000 acres of land in fee. All such reservation lands are put in jeopardy by the Court's strained interpretation. The Court suggests no plausible reason, or any reason at all for that matter, why Congress should or would have sought artificially to place those Indians who hold legal title to their reserva-

---

[5] The Court's opinion states: "Inasmuch as the lands involved are owned in fee simple by the Tuscarora Indian Nation . . . we hold that they are not within a 'reservation' . . . ."

tion lands in such a less-favored position.[6]   The fact that
the Tuscarora Nation holds technical legal title is for-
tuitous and an accidental circumstance probably attrib-
utable to the Indian land policy prevailing at the early
date this reservation was established.   Their lands, like
all other Indian tribal lands, can be sold, leased or sub-
jected to easements only with the consent of the United
States Government.   Congress and government agencies
have always treated the Tuscarora Reservation the same
as all others,[7] and there is no reason even to suspect that
Congress wanted to treat it differently when it passed the
Federal Power Act.

It is necessary to add no more than a word about the
legislative history of this section which the Court relies
on.   The Court points out that the House version of the
1920 Federal Water Power Act (now called the Federal
Power Act) defined "reservations" as meaning only "lands
and interests in lands owned by the United States."   In
this definition of "reservations" the Senate inserted new
words which included the present phrase "tribal lands
embraced   within   Indian   reservations."   If   the   only

[6] In *United States* v. *Candelaria,* 271 U. S. 432, 440, and *United
States* v. *Sandoval,* 231 U. S. 28, 39, this Court has held that the
Pueblos' fee simple ownership of their lands has no effect whatsoever
on the United States' rights and responsibilities towards these Indians
and their lands.   See *The New York Indians,* 5 Wall. 761, 767,
for a similar holding as to Seneca Indian lands in New York gov-
erned by the same treaty under which the Tuscaroras assert their
rights in this case.   And see also ·*United States* v. *Hellard,* 322 U. S.
363, 366 ("The governmental interest . . . is as clear as it would be
if the fee were in the United States") ; *Minnesota* v. *United States,*
305 U. S. 382; *Heckman* v. *United States,* 224 U. S. 413.

[7] See, *e. g.,* Report of the Commissioner of Indian Affairs, H. R.
Exec. Doc. No. 1, Pt. 5, Vol. I, 45th Cong., 2d Sess. 397, 558–564
(1877).   See also 64 Stat. 845, 25 U. S. C. § 233, which specifically
subjects all New York tribes to Rev. Stat. § 2116 (1875), 25 U. S. C.
§ 177, which bans alienation of their lands without the consent of
Congress.   And see generally notes 6, *supra,* 9, 11, 16, 17, 20, *infra.*

Indian lands Congress sought to cover by this section were those to which the United States had title, the Senate addition served no purpose. For the House bill covered all "lands . . . owned by the United States." The only reason for the Senate additions, it seems to me, was to cover lands, like those of the Tuscarora Nation here, title to which was *not* in the United States Government.

The Court also undertakes to support its "artificial" definition of "tribal lands embraced within Indian reservations" by saying that the Congress knew, by a prior decision of this Court, that it was acting under Art. IV, § 3, cl. 2, of the Constitution, which gives Congress power, as the Court says, "to deal only with 'the Territory or other Property belonging to the United States.' " In the first place I do not understand how the Court can say with such assurance that the Congress was acting only under that clause, as there is no evidence whatsoever that Congress expressed itself on this matter. Moreover, it seems far more likely to me that in this phrase regulating Indian tribes Congress was acting under Art. I, § 8, cl. 3, which empowers Congress "To regulate Commerce with . . . the Indian Tribes."

Even accepting for a moment the Court's "artificial" definition, I think the United States owns a sufficient "interest" in these Tuscarora homelands to make them a "reservation" within the meaning of the Act. Section 3 (2) does not merely require a finding in order to take "tribal lands embraced within Indian reservations"; the same finding is required in order to take "other . . . interests in lands owned by the United States" whether tribal or not. Or, again accepting the Court's conception, if the phrase "tribal lands embraced within Indian reservations" must be modified by the words which follow, "lands . . . owned by the United States," it must also be modified by the words "interests in lands owned by the United States," which also follow. Read this way, the

section defines "reservations" as tribal lands in which the United States owns "interests." Thus again a finding under § 4 (e) is required even under the Court's own technical approach if the United States owns "interests" in the lands. I think it does.

Certainly the words Congress used, "interests in lands," are not surplusage; they have some meaning and were intended to accomplish some purpose of their own. The United States undoubtedly controls (has "interests in") many lands in this country that it does not own in fee simple. This is surely true as to all Indian tribal lands, even though the Indians own the fee simple title.[8] Such lands cannot be sold or leased without the consent of the United States Government. The Secretary of the Interior took this position about this very reservation in 1912 when the Tuscaroras desired to lease a part of their lands to private individuals for limestone quarrying.[9] And, of course, the long-accepted concept of a guardian-ward relationship between the United States and its Indians, with all the requirements of fair dealing and protection that this involves, means that the Indians are not free to treat their lands as wholly their own.[10] Anyone doubting the

---

[8] The Court of Appeals held the United States had an adequate § 3 (2) "interest in" the Tuscarora Reservation to require a § 4 (e) finding. 105 U. S. App. D. C. 146, 150, 265 F. 2d 338, 342. See notes 6, *supra*, and 16, *infra*.

[9] See 51 Cong. Rec. 11659–11660, 14561–14562. And see note 16, *infra*.

[10] See, *e. g.*, *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, 657; *Elk* v. *Wilkins*, 112 U. S. 94, 99; *Ex parte Crow Dog*, 109 U. S. 556, 569; *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17. See also *United States* v. *Candelaria*, 271 U. S. 432, 442, where this Court pointed out that the same concept had applied under Spanish and Mexican law. And see also *United States* v. *Kagama*, 118 U. S. 375, 384 ("duty of protection"), and Chief Justice Marshall's leading opinion in *Johnson* v. *M'Intosh*, 8 Wheat. 543, 591 ("Indians [are] to be protected . . . in the possession of their lands").

extent of ownership interest in these lands by the United States would have that doubt rapidly removed should he take a deed from the Tuscarora Nation without the consent of the Government.[11]  I cannot agree, therefore, that this all but technical fee ownership which the United States has in these lands is inadequate to constitute the kind of "interests in lands owned by the United States" which requires a § 4 (e) finding before condemnation.

After the Court concludes that because of its interpretation of the definition of "reservations" in § 3 (2) a finding is not required by § 4 (e) to take the Tuscarora lands, it goes on to find the necessary congressional authorization to take these lands in the general condemnation provisions of § 21.  16 U. S. C. § 814.  I believe that this is an incorrect interpretation of the general power to condemn under § 21, both because Congress specifically provided for the taking of all Indian reservation lands it wanted taken in other sections of the same Act, and because a taking under § 21 is contrary to the manner in which Congress has traditionally gone about the taking of Indian lands—such as Congress here carefully prescribed in § 4 (e).  Congress has been consistent in generally exercising this power to take Indian lands only in accord with prior treaties, only when the Indians themselves consent to be moved, and only by Acts which either specifically refer to Indians or by their terms must include Indian lands.  None of these conditions is satisfied here if § 21 is to be relied upon.  The specific and detailed provisions of § 10 (e), 16 U. S. C. § 803 (e), upon which the Court relies, only emphasize to me the kind of care

---

[11] In *United States* v. *Candelaria,* 271 U. S. 432, for example, this Court held that the United States could set aside a deed from the Pueblos of lands to which the Indians had fee simple title, even though the issue in the case had been settled by otherwise applicable principles of *res judicata* in prior litigation to which the Indians, but not the United States, had been a party.  See note 9, *supra.*

Congress always takes to protect the just claims of Indians to reservations like this one.

The cases which the Court cites in its opinion do not justify the broad meaning read into § 21. Many of those cases deal with taxation—federal and state. The fact that Indians are sometimes taxed like other citizens does not even remotely indicate that Congress has weakened in any way its policy to preserve "tribal lands embraced within Indian reservations." Moreover, cases dealing with individuals who are not Indians are not applicable to tribal reservations. For example, *Shaw* v. *Gibson-Zahniser Oil Corp.*, 276 U. S. 575, cited by the Court, did not involve tribal lands. That case only held that a State may tax the production of an oil company even though it was derived from oil company lands leased from an Indian. The owner there was an individual Indian, not a tribe, and the lands were not and never had been a part of an Indian reservation, but rather had been purchased for this single Indian with the royalties he obtained from his own original restricted allotted lands. In *Henkel* v. *United States*, 237 U. S. 43, which involved the taking of Indian lands for the vast western reclamation project, the Court not only found that it had been "well known to Congress" that Indian lands would have to be taken, 237 U. S., at 50, but the treaty with the Indians involved in that case contained a specific consent by the Indians to such a taking. 29 Stat. 356, quoted 237 U. S., at 48–49. There was no provision even resembling this in the Treaty of 1794 with the Tuscaroras. Other cases relied on by the Court, such as *Spalding* v. *Chandler*, 160 U. S. 394, and *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, all involved statutes that made it clear that Congress was well aware it was authorizing the taking of Indians' lands—unlike the history of § 21 of the Federal Power Act and the 1957 Niagara Power Act, 71 Stat. 401, 16 U. S. C. §§ 836–836a, involved here.

All that I have said so far relates to what the Court calls the "plain words" of the statute. I interpret these "plain words" differently than the Court. But there are other more fundamental and decisive reasons why I disagree with the Court's interpretation of the Federal Power Act as it relates to Indians. The provisions in § 4 (e) which protect Indian reservations against destruction by condemnation cannot be properly construed unless considered as a part of a body of Indian laws built up throughout this Nation's history, and extending back even to the Articles of Confederation. It is necessary to summarize briefly a part of that history.

The experience of the Tuscarora Nation illustrates this history as well as that of any Indian tribe.[12] When this country was discovered the Tuscaroras lived and owned their homelands in the area that later became North Carolina. Early settlers wanted their lands. The Tuscaroras did not want to give them up. Numerous conflicts arose because of this clash of desires. Finally, about 1710, there was a war between the Tuscaroras and the colonists in North and South Carolina. The Indians were routed. A majority of their warriors were killed. Hundreds of their men, women and children were captured and sold into slavery. Nearly all of the remainder

---

[12] For general discussions of the Tuscaroras' history see Hodge (editor), Handbook of American Indians (1910), Pt. 2, 842–853, Smithsonian Institution Bureau of American Ethnology, Bulletin 30, H. R. Doc. No. 926, Part 2, 59th Cong., 1st Sess.; Cohen, Handbook of Federal Indian Law (1941), 423; Morgan, League of the Iroquois (1904), I, 23, 42, 93, II, 77, 187, 305; Cusick, Ancient History of the Six Nations (1848), 31–35; H. R. Doc. No. 1590, 63d Cong., 3d Sess. 7, 11–15 (1915); H. R. Exec. Doc. No. 1, Pt. 5, Vol. I, 45th Cong., 2d Sess. 562–563 (1877). And see statements in *New York Indians* v. *United States*, 30 Ct. Cl. 413 (1895); *Tuscarora Nation of Indians* v. *Power Authority of New York*, 164 F. Supp. 107 (D. C. W. D. N. Y. 1958); *People ex rel. Cusick* v. *Daly*, 212 N. Y. 183, 190, 105 N. E. 1048, 1050 (1914).

of the tribe fled. They found a home in distant New York with the Iroquois Confederation of Nations. With their acceptance into the Confederation about 1720 it became known as the Six Nations. Historical accounts indicate that about 1780 those Tuscaroras who had supported America in the Revolution were compelled to leave their first residence in New York because of the hostility of Indians who had fought with the British against the Colonies.[13] They migrated to the Village of Lewiston, New York, near Niagara Falls and settled in that area as their new home. They have remained there ever since—nearly 180 years. When their legal right to this land came into question about 1800 the Seneca Indians and the Holland Land Company both "thought their claim so just" [14] that they gave the Tuscarora Nation deeds to three square miles of the area they had been occupying for about 20 years. With the assistance of Presidents Washington and Jefferson and the Congress, the Tuscaroras were able, through the Secretary of War, to sell their vast North Carolina lands for $15,000. With this money, held by the Secretary of War as trustee, additional lands adjoining those received from the Seneca Indians and the Holland Land Company were obtained for the Tuscarora Nation and the title held in trust by the Secretary of War from 1804 to 1809. The Secretary supervised the payments to the Holland Land Company, from which the additional 4,329 acres were obtained, and when payments were completed he conveyed these lands to the Tuscarora Nation.[15] The 1,383 acres of the Tusca-

---

[13] See Handbook of American Indians, *op. cit.*, *supra*, note 12, at 848; Wilson, Apologies to the Iroquois (1960), 135.

[14] Letter from Theophile Cazenove to Joseph Ellicott, May 10, 1798, 1 Bingham (editor), Holland Land Company's Papers: Reports of Joseph Ellicott (Buffalo Hist. Soc. Pub. Vol. 32, 1937) 21, 23.

[15] In addition to the general histories cited, note 12, *supra*, this particular transaction is described in various letters and speeches

rora Reservation involved today is a part of this purchase. Despite all this and the Government's continuing guardianship over these Indians and their lands throughout the years the Court attempts to justify this taking on the single ground that the Indians, not the United States Government, now own the fee simple title to this property.

In 1838 the Government made a treaty with the Tuscaroras under which they were to be removed to other parts of the United States.[16] The removal was to be carried

of the Tuscaroras and the Secretary of War. See Letters Sent by the Secretary of War Relating to Indian Affairs (National Archives, Record Group 75, Interior Branch), Vol. A, 18–19, 22–23, 113–114, 117–119, 147–148, 402, 425–426, 438–439, Vol. B, 29, 274, 421; 6 Buffalo Hist. Soc. Pub. 221; and letter from Erastus Granger to Secretary of War Henry Dearborn, July 20, 1804, in Buffalo Hist. Soc. manuscript files. The deeds are recorded in the Niagara County Clerk's Office, Lockport, New York, Nov. 21, 1804, Liber B, pp. 2–7; Jan. 2, 1809, Liber A, p. 5. "[I]n 1804 Congress authorized the Secretary of War to purchase additional land for these Indians." From a Department of Interior letter, H. R. Doc. No. 1590, 63d Cong., 3d Sess. 7. And see the Court's note 10, and *Fellows* v. *Blacksmith*, 19 How. 366.

[16] Treaty of January 15, 1838, 7 Stat. 550, 554 (Article 14, "Special Provisions for the Tuscaroras").

The interest of the government in Indian lands was a part of the law of Spain, Mexico, Great Britain and other European powers during pre-Colonial days. *United States* v. *Candelaria*, 271 U. S. 432, 442; *United States* v. *Kagama*, 118 U. S. 375, 381; *Worcester* v. *Georgia*, 6 Pet. 515, 551–552; *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17–18. The original Articles of Confederation provided for congressional control of Indian affairs in Article 9. A similar provision is in the Commerce Clause of the present Constitution. One of the first Acts of the new Congress was the so-called Non-Intercourse Act of July 22, 1790, 1 Stat. 137, which provided, in § 4, "That no sale of lands made by any Indians . . . shall be valid . . . unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." The similar provision is presently found in 25 U. S. C. § 177, as modified by Rev. Stat. § 2079, 25 U. S. C. § 71.

out under the authority of a Congressional Act of 1830, 4 Stat. 411, which provided a program for removing the Indians from the Eastern United States to the West. Section 3 of that Act provided authority "for the President solemnly to assure the tribe or nation with which the exchange is made, that the United States will forever secure and guaranty to them, and their heirs or successors, the country so exchanged with them . . . ." The same Act also provided "That nothing in this act contained shall be construed as authorizing or directing the violation of any existing treaty between the United States and any of the Indian tribes." *Id.*, § 7.

The Tuscarora Nation then had such a treaty with the United States, which had been in existence since 1794 and is still recognized by Congress today.[17] The treaty

---

[17] Treaty of November 11, 1794, 7 Stat. 44. Article VI of that Treaty provides:

"[B]ecause the United States desire, with humanity and kindness, to contribute to their comfortable support . . . the United States will add the sum of three thousand dollars to the one thousand five hundred dollars, heretofore allowed them by an article ratified by the President [April 23, 1792]; making in the whole, four thousand five hundred dollars; which shall be expended yearly forever, in purchasing cloathing, [etc.]. . . ."

Every Congress until the 81st indicated that their $4,500 annual appropriation rested upon "article 6, treaty of November 11, 1794." *E. g.*, 62 Stat. 1120, 80th Cong., 2d Sess. Subsequent Congresses simply appropriated a total amount for Indian treaty obligations including "treaties with Senecas and Six Nations of New York . . . ." *E. g.*, 63 Stat. 774, 81st Cong., 1st Sess. In 1951 the 82d Cong., 1st Sess., appropriated simply "such amounts as may be necessary after June 30, 1951" for this purpose. 65 Stat. 254. At the hearings it was explained that this provision "would have the effect of being permanent law insofar as making the funds available without having to be included in each annual appropriation act. . . . [I]t is a treaty obligation and has always been paid by the Government in full. . . . These treaties have been in existence for many, many years." Director D. Otis Beasley, Division of Budget and Finance, Department

was made with all the Six Nations, at a time when the Tuscarora Nation had been a member for over 70 years, and one of their representatives signed the treaty.[18]   In Article III of the Treaty the United States Government made this solemn promise:

> "Now, the United States acknowledge all the land within the aforementioned boundaries, to be the property of the Seneka nation; and the United States will never claim the same, nor disturb the Seneka nation, nor any of the Six Nations, or of their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but it shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase."

This article of the 1794 Treaty substantially repeated the promise given the Tuscaroras in the prior 1784 Treaty, 7 Stat. 15, made before our Constitution was adopted, that "The Oneida and Tuscarora nations shall be secured in the possession of the lands on which they are settled."

Of course it is true that in 1794, when the Treaty was signed, the Tuscarora Nation did not yet have the technical legal title to that part of the reservation which the Government was later able to obtain for it.   But the solemn pledge of the United States to its wards is not to be construed like a money-lender's mortgage.   Up to this

---

of the Interior, Hearings on Interior Department Appropriations for 1952 before the Subcommittee on Interior Department of the House Committee on Appropriations, 82d Cong., 1st Sess., Pt. 2, 1747, 1764.

[18] "Kanatsoyh, alias Nicholas Kusik," signed the 1794 Treaty as a Tuscarora, but is not so identified there.   However, he also signed the Treaties of December 2, 1794, 7 Stat. 47, and January 15, 1838, 7 Stat. 550, for the Tuscarora Nation and is listed there as a "Tuscarora."   It has never even been hinted, until the Court's note 18 today, that the Tuscarora Nation is for some reason not included in this November 11, 1794, Six Nations' Treaty.

time it has always been the established rule that this Court would give treaties with the Indians an enlarged interpretation; one that would assure them beyond all doubt that this Government does not engage in sharp practices with its wards.[19] This very principle of interpretation was applied in the case of *The New York Indians,* 5 Wall. 761, 768, where the Court said, about *this* treaty:

> "It has already been shown that the United States have acknowledged the reservations to be the property of the Seneca nation—that they will never claim them nor disturb this nation in their free use and enjoyment, and that they shall remain theirs until they choose to sell them. These are the guarantees given by the United States, and which her faith is pledged to uphold."

After the Treaty of 1838 was signed, in which the Tuscaroras agreed to go west, they decided not to do so, and the Government respected their objections and left them with their land. They have, since that time, held it as other Indians have throughout the Nation. This has been in accord with the settled general policy to preserve such reservations against any kind of taking,

---

[19] *The Kansas Indians,* 5 Wall. 737, 760 ("enlarged rules of construction are adopted in reference to Indian treaties"); *Worcester v. Georgia,* 6 Pet. 515, 582 ("The language used in treaties with the Indians should never be construed to their prejudice. . . . How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction") (concurring opinion); *Tulee v. Washington,* 315 U. S. 681, 684–685 ("in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people"). And see *Spalding v. Chandler,* 160 U. S. 394, 405; *Elk v. Wilkins,* 112 U. S. 94, 100; *Ex parte Crow Dog,* 109 U. S. 556, 572; *United States v. Rogers,* 4 How. 567, 572.

whether by private citizens or government, that might result in depriving Indian tribes of their homelands against their will.[20]   President Jackson, in 1835, explained the purpose of the removal and reservation program as

---

[20] The origins of this policy extend into pre-Colonial British history. As Chief Justice Marshall said in *Worcester* v. *Georgia*, 6 Pet. 515, 547, in speaking of the Indian land policy,

"The king purchased their lands when they were willing to sell, at a price they were willing to take; but never coerced a surrender of them."

Chief Justice Marshall quoted at the same place similar language from a speech made to the American Indians by the British Superintendent of Indian affairs in 1763.   This principle has been consistently recognized by this Government and this Court. *Spalding* v. *Chandler*, 160 U. S. 394, 403; *United States* v. *Forty-three Gallons of Whiskey*, 93 U. S. 188, 197; *The New York Indians*, 5 Wall. 761, 768; *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17; *Johnson* v. *M'Intosh*, 8 Wheat. 543.   And see 48 Stat. 987, 25 U. S. C. § 476; 25 U. S. C. §§ 311–328 and 25 CFR § 161.3 (a).

The age and scope of this doctrine of guardianship and fairness to the Indians is well illustrated in a statement made by President Washington, December 29, 1790, responding to an address by the chiefs and councilors of the Seneca Nation:

"I am not uninformed, that the Six Nations have been led into some difficulties, with respect to the sale of their lands, since the peace.   But I must inform you that these evils arose before the present Government of the United States was established, when the separate States, and individuals under their authority, undertook to treat with the Indian tribes respecting the sale of their lands.   But the case is now entirely altered; the General Government, only, has the power to treat with the Indian nations, and any treaty formed, and held without its authority, will not be binding.

"Here, then, is the security for the remainder of your lands.   No State, nor person, can purchase your lands, unless at some public treaty, held under the authority of the United States.   The General Government will never consent to your being defrauded, but it will protect you in all your just rights." 4 American State Papers (Indian Affairs, Vol. I, 1832) 142; 31 Washington, Writings (United States George Washington Bicentennial Comm'n ed. 1939) 179, 180.

meaning that, "The pledge of the United States has been given by Congress that the country destined for the residence of this people shall be forever 'secured and guaranteed to them.' " [21] This policy was so well settled that when the Missouri compromise bill was being discussed in Congress in 1854 Texas Senator Sam Houston used this picturesque language to describe the Government's promise to the Indians:

> "As long as water flows, or grass grows upon the earth, or the sun rises to show your pathway, or you kindle your camp fires, so long shall you be protected by this Government, and never again removed from your present habitations." [22]

It was to carry out these sacred promises made to protect the security of Indian reservations that Congress adopted § 4 (e) which forbids the taking of an Indian reservation for a power project if it will "interfere . . . with the purpose for which such reservation was created or acquired . . . ." But no such finding was made or could be made here.

There can be no doubt as to the importance of this power project. It will be one of the largest in this country and probably will have cost over $700,000,000 when it is completed. It is true that it will undoubtedly cost more to build a proper reservoir without the Tuscarora lands, and that there has already been some delay by reason of this controversy. The use of lands other than those of the tribe will cause the abandonment of more homes and the removal of more people. If the decision in this case depended exclusively upon cost and inconvenience, the Authority undoubtedly would have

---

[21] Seventh Annual Message, Dec. 7, 1835, 3 Richardson, Messages and Papers of the Presidents 1789–1897, 147, 172.

[22] Cong. Globe, 33d Cong., 1st Sess., App. 202. See 1 Morison and Commager, The Growth of the American Republic (1950), 621.

been justified in using the Tuscarora lands. But the Federal Power Act requires far more than that to justify breaking up this Indian reservation.

These Indians have a way of life which this Government has seen fit to protect, if not actually to encourage. Cogent arguments can be made that it would be better for all concerned if Indians were to abandon their old customs and habits, and become incorporated in the communities where they reside. The fact remains, however, that they have *not* done this and that they have continued their tribal life with trust in a promise of security from this Government.

Of course, Congress has power to change this traditional policy when it sees fit. But when such changes have been made Congress has ordinarily been scrupulously careful to see that new conditions leave the Indians satisfied. Until Congress has a chance to express itself far more clearly than it has here the Tuscaroras are entitled to keep their reservation. It would be far better to let the Power Authority present the matter to Congress and request its consent to take these lands. It is not too late for it to do so now. If, as has been argued here, Congress has already impliedly authorized the taking, there can be no reason why it would not pass a measure at once confirming its authorization. It has been known to pass a Joint Resolution in one day where this Court interpreted an Act in a way it did not like. See *Commissioner* v. *Estate of Church,* 335 U. S. 632, 639–640. Such action would simply put this question of authorization back into the hands of the Legislative Department of the Government where the Constitution wisely reposed it.[23]

---

[23] See, *e. g., United States* v. *Hellard,* 322 U. S. 363, 367 ("the power of Congress over Indian affairs is plenary") ; *United States* v. *Sandoval,* 231 U. S. 28, 45–46; *Tiger* v. *Western Investment Co.,* 221 U. S. 286, 315 ("It is for that body [Congress], and not the courts") ; *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 565 ("Plenary authority over

It may be hard for us to understand why these Indians cling so tenaciously to their lands and traditional tribal way of life.[24]   The record does not leave the impression that the lands of their reservation are the most fertile, the landscape the most beautiful or their homes the most splendid specimens of architecture.   But this is their home—their ancestral home.   There, they, their children, and their forebears were born.   They, too, have their memories and their loves.   Some things are worth more than money and the costs of a new enterprise.

There may be instances in which Congress has broken faith with the Indians, although examples of such action have not been pointed out to us.   Whether it has done so before now or not, however, I am not convinced that it has done so here.   I regret that this Court is to be the governmental agency that breaks faith with this dependent people.   Great nations, like great men, should keep their word.

---

the tribal relations of the Indians has been exercised by Congress from the beginning . . . not . . . the judicial department of the government") ; *United States* v. *Rogers,* 4 How. 567, 572.

[24] "As we understand the position of the tribe, they do not complain so much of a possible lease or license for the use of the lands as they complain of a possible permanent loss of part of their homelands."   Letter from Under Secretary of the Interior Bennett to Federal Power Commission Chairman Kuykendall, December 19, 1958, relating to the taking of these Tuscarora lands for the Niagara Power Project.